# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                         No. 1:17-cr-01235-WJ

MATTHEW WOODS

    Defendant[1].

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT WOOD'S JOINT MOTION TO EXCLUDE GOVERNMENT'S EXPERT WITNESSES

THIS MATTER comes before the Court upon Defendant Wood's Joint Motion to Exclude Government's Expert Witnesses or in the Alternative to Hold a *Daubert* Hearing, filed March 30, 2018 (**Doc. 190**). Defendant Woods ("Defendant" or "Woods") is charged with crimes related to alleged involvement in a commercial sex trafficking ring referred to by the Government as the "Galloway Organization." Woods motion is granted in that the Court conducted a *Daubert* hearing; however, after hearing testimony from the proposed expert witnesses and after considering the oral and written arguments of counsel, the Court DENIES the motion to exclude the Government's expert witness testimony.

## BACKGROUND

In this *Daubert* motion, Defendant seeks to exclude the testimony of several Government expert witnesses, specifically: Kim Mehlman-Orozco and Special Agent Morgan Langer ("SA

---

[1] The original indictment was filed against five defendants. One defendant was dismissed from the case and three defendants have entered into plea agreements with the Government, so Defendant Matthew Woods is the sole remaining defendant in this case.

Langer").[2] The Government's objective is to offer their testimony to counter Defendant's position that the victims in this case were active and willing participants in the organization. Dr. Mehlman-Orozco is expected to testify regarding the clandestine nature of human trafficking crimes; the trauma bond that exists between victims of human trafficking; and the complex reactions due to trauma bonding with their offender." SA Langer will testify regarding the various characteristics of human traffickers based on training & experience.

## DISCUSSION

A district court's gate-keeping function involves a three-step analysis. First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training or education" to render an opinion. See Fed.R.Evid. 702. Second, if the witness is so qualified, the Court must determine whether the expert's opinions are "reliable" under the principles set forth under *Daubert v. Merrell Dow Pharm., Inc.*, and *Kumho Tire Co., Ltd. v. Carmichael*. 509 U.S. 579, 597 (1993) and 526 U.S. 137 (1999); *see also Ralston v. Smith & Nephew Richards, Inc*. 275 F.3d 965 (10th Cir. 2001). Third, Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. *Daubert,* 509 U.S. at 591 (". . . Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility").

*Qualifications***:** Defendant's objections to the Government's experts focus on reliability and relevance. Defendant does not offer any challenge to the qualifications of either expert, but the Court will quickly review these qualifications for the record.

*Reliability:* The district court must ensure that any expert testimony admitted rests on a reliable foundation and is relevant to the task at hand. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The burden of proof is on the proponent of the expert, in this case the

---

[2] Defendant's challenges to the Government's expert witnesses were narrowed at the hearing.

Government. *See U.S. v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (quoting Fed. R. Evid. 702). In *Daubert*, the Supreme Court set out a non-exhaustive set of factors that trial courts may consider in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. 509 U.S. at 593-94. *Daubert* itself was limited to scientific evidence, *see U.S. v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009), but in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court made clear that the gatekeeping obligation of the district courts described in *Daubert* applies, not just to scientific testimony, but to all expert testimony. *Id.* at 141. While a district court may consider the *Daubert* factors in determining the admissibility of non-scientific expert testimony to the extent they are relevant, *id.* at 150, the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. The law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination. *Id.* at 141-42; *see Witherspoon v. Navajo Ref. Co., LP*, 2005 WL 5988649 at *3 (D.N.M., July 18, 2005) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

    ***Relevance*:** To be relevant, proposed expert testimony must logically advance a material aspect of the case," *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n. 2 (10th Cir. 2005), and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591(1993). (quotation omitted). In assessing whether testimony will assist the trier of fact, district courts consider several factors,

including whether the testimony "is within the juror's common knowledge and experience," and "whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (footnote omitted). Pursuant to Rule 702, courts must conduct a "common-sense inquiry" into whether a juror would be able to understand certain evidence without specialized knowledge. *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir.2000).

**I.      Dr. Mehlman-Orozco**

   A.      Qualifications

Dr. Mehlman-Orozco considers herself a leading expert in cases on sex trafficking and the Court agrees with that self-description. She has participated extensively and been a speaker at conferences on the issue; has conducted training for law enforcement personnel in recognizing and dealing with sex trafficking cases; has written numerous articles, including a book which is used as a training manual for law enforcement. Dr. Mehlman-Orozco is the only human trafficking expert qualified on the Los Angeles Superior Court panel of experts, and has testified mostly in state court, but has also testified in federal court. Defendant raises no specific issue regarding her qualifications and the Court finds that she satisfies *Daubert*'s requirements.

   B.      Reliability of Opinion Testimony

Dr. Mehlman-Orozco described how her training guides her approach in developing an opinion in the area of sex trafficking:

- She is trained in survey methodology as well as the collection and analysis of data and uses these methods in approaching the subject matter on which she provides opinions;

- Dr. Mehlman-Orozco has kept current on research methods, although she noted that it is difficult in this area to identify sex trafficking cases;

- She uses quantitative data to focus on prevalence/prediction/causation and quantitative studies rather than relying solely on qualitative information based on interviews.

However, her books focus more on qualitative information. Dr. Mehlman-Orozco pointed out that because human trafficking involves human relationships, this is an area where quantitative information is more difficult to come by.

- Dr. Mehlman-Orozco uses the Michigan Law Center Human Trafficking data base to set up interviews with victims as well as numerous interviews with about a half dozen people convicted of sex trafficking in order to understand how they recruit/control their victims. These interviews corroborated other studies that were done and were included in her publications:

    (1) a 2017 scholarly, peer-reviewed publication entitled "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers" that was published in Trends in Organized Crime. Doc. 201-1. That article was the end product of Dr. Mehlman-Orozco's qualitative research that delved into portrayed and self-identities of sex traffickers. This peer-reviewed article was also recently accepted for presentation at the 2018 American Society of Criminology academic conference in Atlanta, Georgia;

    (2) In 2015, Dr. Mehlman-Orozco's peer-reviewed, scholarly article "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice," was published in the Journal of Social Inclusion, which was guest edited by Siddharth Kara, author of Sex Trafficking: Inside the Business of Modern Slavery and Director of the Program on Human Trafficking and Modern Slavery at the Kennedy School of Government at Harvard University and is attached hereto as Exhibit 2. For this article, Dr. Mehlman-Orozco analyzed yearly court data on juvenile prostitution arrests aggregated at the state level to explore the criminalization of commercial sexually exploited children post safe harbor policy implementation; and

    (3) in the fall of 2017, Dr. Mehlman-Orozco published Hidden in Plain Sight: America's Slaves of the New Millennium, a book that examines trends in sex and labor trafficking in the United States, and is used as a manual to train law enforcement.

- Dr. Mehlman-Orozco has also conducted an extensive review of available case law, relying on what she referred to as a "triangulating data source" by looking at what information is available and then filling in gaps by interviewing people convicted of sex trafficking and understanding how they recruit/control their victims. Much of her content analysis focused on Michigan state case law, which Dr. Mehlman-Orozco stated had a "robust collection" of case law pertaining to sex trafficking.

Despite Dr. Mehlman-Orozco's description of the methodological approach, Defendant characterizes her work as anecdotal, but this characterization is unfounded based on the

testimony given at the hearing.  Dr. Mehlman-Orozco's expertise may have been derived to a large degree from qualitative studies, but her expertise is undeniably based on scholarly and peer-reviewed work regarding how the sex trafficking industry works.  She has published peer-reviewed journal articles and research papers; has appeared on TV discussing trafficking and trends; and served as a peer reviewer for journals and grant applications.  Dr. Mehlman-Orozco stated that in developing her research, she does not rely on any one journal, but rather focuses on specific researchers who have published on human trafficking issues in various journals, such as the Journal of Human Trafficking and criminal article journals.

The basis for Dr. Mehlman-Orozco's opinion testimony is hardly premised on mere "observation," as Defendant contends. Rather, the Court finds that (1) these numerous publications contain the intellectual rigor to meet *Daubert's* vigorous peer-review standards; (2) that Dr. Mehlman-Orozco's opinion testimony is tied scientifically to qualitative experience through interviews with victims, traffickers and sex workers; and (3) that it includes some quantitative methodology based on her own research and her  studies related to published research by colleagues in the field and through her participation in conferences on the subject.

Defendant also questions the reliability of Dr. Mehlman-Orozco's methodology by claiming that her opinion is based on her own "interpretation" of the case law, and that in identifying whether conduct qualifies as sex trafficking, Dr. Mehlman-Orozco simply keys off the legal elements of the federal sex trafficking statute, 18 U.S.C. §1591 as a benchmark (using force, threats of force, fraud or coercion to cause a person to cause the person to engage in a commercial sex act, or causing a person under 18 years of age to engage in a commercial sex act).

The Court soundly rejects this challenge as well, finding that Dr. Mehlman-Orozco's opinion testimony is not merely a "gloss" on the federal statutory elements, nor is her review of cases premised on her own "interpretation" of the law. Dr. Mehlman-Orozco testified that she approaches case law by conducting a systematic qualitative review from the viewpoint of a researcher, not as a lawyer and reviews cases looking for what occurs commonly across these cases as well as what does not occur. She stated that she does not apply or interpret the law. As a researcher she does not use anecdote to form her opinions, nor does she use an *a priori* opinion as a starting point. Rather, she studies the case law to determine whether the elements contained in the cases are consistent with her research experience and with the work she has done independently. The Court does not consider any part of this approach to constitute a "gloss" on the federal sex trafficking statute nor on the relevant case law.

The Court therefore finds that the opinion testimony offered by Dr. Mehlman-Orozco satisfies the reliability requirements set forth under *Daubert*.

C. Relevance

The next question is whether Dr. Mehlman-Orozco's testimony will be relevant in that it will assist the jury.

At the hearing, Dr. Mehlman-Orozco described the topics on which she would offer testimony, beginning with her observation that depictions of sex trafficking by the mainstream media are misinformed. For example, she noted that so-called "experts" are skeptical that a child can be engaged in sex work, when the erroneous criminalization of victims is more the reality, where children are quite often criminalized and arrested for prostitution. Another misconception is encouraged through the mainstream media's glamorization of pimping—which involves consenting relationships, are victimless and is a concept distinct from sex trafficking. Still

another misconception is that trafficking works through physical force, discounting the element of coercion through a formed relationship or through trauma bonding. In sex trafficking trauma bonding, the victim develops a positive affinity and emotional bond, with the trafficker making it difficult for victims to leave or to cooperate with law enforcement.  Dr. Mehlman-Orozco also noted that while a victim can have trauma bonds with various people in the trafficking organization, they are not usually developed with the trafficker's "enforcer" who assists in gaining compliance from the victim.

      Dr. Mehlman-Orozco described the different methods used by traffickers to sustain their hold over victims, such as debt bondage and rewards (clothing, jewelry, treatment—which in turn increases the trafficker's profit margin in making the victim more attractive as an asset), and which keep the victim returning to the trafficker.  Victims become compliant to the particular brand of exploitation, and traffickers themselves fall into different categories showing different psychologies and approaches to recruitment and control methods, for example: (1) the "Romeo-style" approach; (2) the "heavy-handed guerilla" approach utilizing physical abuse where traffickers have sex with victims showing dominance by raping and traumatizing them; and the use of other women as well as other victims to recruit—which often leads to victims becoming traffickers themselves).

      Dr. Mehlman-Orozco's opinion testimony will also include a description of the factors that render an individual at a higher risk and more inclined to victimization (a need for some kind of basic need such as housing or food; love and belonging; and even self-esteem) and which create a void that a trafficker seeks to fill. For example, victims with violent traffickers will often present with domestic violence issues that become part of that trauma bond.  Age can play into

recruitment, as younger victims are easier to target and control, and parents can themselves allow trafficking to happen.

On cross-examination, defense counsel asked Dr. Mehlman-Orozco to distinguish between sex trafficking and consensual pimping, referring to domestic violence situations as an example. Dr. Mehlman-Orozco responded that in making a determination whether a situation was sex trafficking or a consensual relationship, one could not make this conclusion based on any one or two specific factors (such as how many times one slapped a domestic partner or how the individuals involves split the profits from commercial sex).[3] Rather, one could only draw conclusions after considering whether certain elements are consistent with trauma bonding which has been determined to exist in other cases, such as: Did the victim return to the offender? Is the victim cooperating with law enforcement? Does the victim wish to disclose the abuse?

Dr. Mehlman-Orozco's testimony will touch on topics of consent, the existence of trauma bonds and characteristics of victims and sex traffickers. All of these are relevant to providing the jury with the information necessary to determine the issues to be tried in this case. In light of the misrepresentations fostered by the mainstream media about sex trafficking versus consensual commercial sex, her testimony becomes all the more critical in ensuring that the jury is well-informed.

Nevertheless, Defendant seeks to limit Dr. Mehlman-Orozco's opinion testimony to that of a general principles expert. Specifically, defense counsel requests that the Court bar her from using hypotheticals that might allude to the facts of this cases and from describing the characteristics of sex trafficking. The Court denies the request. The Court notes that Dr. Mehlman-Orozco was not provided and did not review, any records in this case. As she

---

[3] To illustrate, defense counsel asked Dr. Mehlman-Orozco whether making false promises to a girlfriend to obtain sex qualified as sex trafficking, but she responded that this kind of a situation was distinguished from sex trafficking because it did not involve *commercial* sex.

explained, the purpose of her testimony was to describe the different facets of sex trafficking and trauma bonding, but in the end the jury would have to decide whether and how it has any connection to the instant case. Limiting the testimony as defense counsel suggests serves no useful purpose and in fact will hamper the ability of Dr. Mehlman-Orozco to provide helpful information to the jury which she is well-qualified to give.

The information offered by Dr. Mehlman-Orozco is not within the common knowledge of laypersons. In fact, the very questions asked by defense counsel on cross-examination demonstrate the lack of common misperceptions misinformation laypersons might bring with them to deliberate on these matters. The Court therefore finds that Dr. Mehlman-Orozco's testimony will help the jury decide the issues that remain to be tried in this case and will not usurp the jury's function in assessing credibility.

D.       Rule 403 Balancing

Under Fed.R.Evid. 403, the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Defendant does not explicitly argue that Dr. Mehlman-Orozco's testimony would violate Rule 403, but the Court has considered this as a possible reason behind defense counsel's request to limit the scope of that testimony. However, the Court finds that none of Rule 403's balancing factors are at risk if Dr. Mehlman-Orozco's testimony is allowed. While some of the testimony may hit close to home in this case, none of the testimony to be given is *unfairly* prejudicial under Rule 403.

Accordingly, the Court finds that Dr. Mehlman-Orozco meets all the pertinent *Daubert* qualifications as an expert.

## II.     Special Agent Morgan Langer ("SA Langer")

### A.     Qualifications

SA Langer is a special agent with Homeland Security Investigations ("HSI") and has investigated sex trafficking cases since 2012.  He has a Masters Degree in Criminal Justice and offers training to other law enforcement officers, prosecutors, judges, health professionals, teachers and politicians, as well as those who provide services to victims of sex trafficking. Other law enforcement agencies also contact him because they have less experience in sex trafficking cases, such as Alcohol Tobacco and Firearms ("ATF"), Drug Enforcement Administration ("DEA") and other non-governmental and non-profit organizations ("NGO"). He explained that teachers or health care providers need training in this subject area because they might come into contact with victims of abuse or who have sexually transmitted disease and their familiarity with sex trafficking could prevent these victims from slipping between the cracks. Also, knowing more about sex trafficking could encourage these providers to contact HSI when they see "red flags" that could be signs of sex trafficking victims.  SA Langer has investigated over 500 sex trafficking cases, has interviewed hundreds of victims (with minors accounting for under 5%).

Defendant does not challenge SA Langer's qualifications, and based on the above information, the Court finds SA Langer to be qualified as an expert under *Daubert* standards.

### B.     Reliability of Opinion Testimony

SA Langer will testify regarding the various characteristics of human trafficking based on his training and experience and will describe how the sex trafficking industry works, beginning

with advertising for commercial sex on certain websites such as Backpage.com. Identifying sex trafficking websites is not an exact science, but he is familiar with certain indicia of sex trafficking websites, such as the use of exploitive photos of women of very young individuals.[4] Customers do not consider that websites that advertise for commercial sex could be part of a sex trafficking ring.

      SA Langer is also familiar with how the commercial sex operations are run and with the terminology that is used in sex trafficking. For example, sex traffickers know that customers don't like to talk to a male on the phone when setting up calls since a male voice signifies a "red flag," and so women usually answer the phone in these operations and do the talking. Also, the trafficker is generally not present in the room where the transaction is carried out, but rather in the background as an observer. SA Langer will testify, based on his experience and training, about the methods used by traffickers to control victims which vary according to the particular characteristics of the traffickers and about the characteristics of victims, who are reluctant to disclose information about the experience and who see law enforcement as the enemy.

      Some victims have been coached not to trust by traffickers who describe threats of "detox" in jail. SA Langer noted that these victim characteristics affect how interviews are conducted since SA Langer is a law enforcement officer. Victims are as a result, often hostile, introverted and closed off and it sometimes requires four or five encounters/interviews with the victims before any information can be obtained. He stated that he makes it clear to the victims during the interviews that he is not there to arrest them and offers them services.

      Defendant challenges the reliability of SA Langer's opinion testimony because it is not based on a scientific method in determining whether an advertisement or website is actually

---

[4] Backpage.com was a website address relevant to this case which is no longer operational.

connected to sex trafficking. The Court rejects this argument because opinion testimony does not have to be "scientific" in order to meet *Daubert* standards. As mentioned previously, while *Daubert* itself was limited to scientific evidence, in *Kumho Tire Co.*, the Supreme Court made clear that the gatekeeping obligation of the district courts described in *Daubert* applies, not just to scientific testimony, but to all expert testimony. 526 U.S. 137, 141 (1999); *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009). Thus, the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. *Id.* at 141-42.

SA Langer's testimony is clearly not based on scientific evidence but rather on SA Langer's training and experience which is extensive on the subject of sex trafficking. *See United States v. Monteiro*, 407 F.Supp.2d 351, 357 (D. Mass. 2006) (compiling cases) (noting that many courts have recognized that the list of factors the Supreme Court outlined in *Daubert* "may not perfectly fit every type of expert testimony, particularly technical testimony based primarily on the training and experience of the expert.").[5] Based on the proffered testimony of SA Langer, as well as his experience and training, the Court finds that this expert meets *Daubert's* reliability requirements.

---

[5] The Sixth Circuit offers an interesting analogy to distinguish between scientific and non-scientific expert testimony:

> By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts. . . On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry v. City of Detroit* 25 F.3d 1342, 1349 1350 (6th Cir. 1994).

    C.    <u>Relevance</u>

Defendant contends that SA Langer's testimony will not be helpful to the jury because the information SA Langer offers is within the grasp of any lay person. Counsel distinguished this case from drug trafficking cases where an expert would be helpful to testify as to drug amounts that constitute non-personal use.

Pursuant to Rule 702, courts must conduct a "common-sense inquiry" into whether a juror would be able to understand certain evidence without specialized knowledge. *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir.2000). The Court disagrees with Defendant's assessment of SA Langer's testimony and finds that the testimony will both assist the jury and not usurp the jury's function in assessing credibility. First, sex trafficking is not within a layperson's common knowledge and experience. Most laypersons obtain information about the subject from the mainstream media which itself depicts many misconceptions about sex trafficking—particularly in how it affects younger individuals. Second, sex trafficking differs with geographic locations, and SA Langer is knowledgeable regarding local sex trafficking operations. Third, while aspects of SA Langer's testimony potentially overlap somewhat with Dr. Mehlman-Orozco's testimony, their opinions are helpful in different ways. Dr. Mehlman-Orozco offers a scientific and scholarly perspective on how sex trafficking affects victims: why victims react the way they do and the methods traffickers use to get victims to comply. SA Langer brings a local, "on the ground," law enforcement view to the subject: how sex trafficking advertises for customers, how it actually operates—much like DEA experts. SA Langer can testify on matters through in his experience that Dr. Mehlman-Orozco cannot do from her research and interviews. Laypersons are not familiar with such matters and the Court finds that SA Langer's testimony meets *Daubert's* relevance criteria.

D.      <u>Rule 403 Balancing</u>

Again, Defendant does not explicitly argue that SA Langer's testimony violates Rule 403, and the Court find that no reason to exclude this testimony for reasons of unfair prejudice, confusion, misleading the issues or needlessly presenting cumulative evidence. As the Court has just discussed, Dr. Mehlman-Orozco and SA Langer offer different viewpoints and information on sex trafficking.

**THEREFORE,**

Defendant Wood's Joint Motion to Exclude Government's Expert Witnesses or in the Alternative to Hold a *Daubert* Hearing **(Doc. 190)**, is GRANTED in that the Court held an evidentiary *Daubert* hearing, but Defendant Woods' request to exclude the testimony of Dr. Mehlman-Orozco and SA Langer is DENIED for reasons described in this Memorandum Opinion and Order.

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE