1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3    _____
                                     )
4    UNITED STATES OF AMERICA,       )   No. 1:17-CR-01235-WJ
                                     )
5              Plaintiff,            )
                                     )   Pete V. Domenici U.S. Courthouse
6         vs.                        )   Albuquerque, New Mexico
                                     )
7    MATTHEW WOODS,                  )   Tuesday, October 27, 2020
                                     )   9:30 A.M.
8              Defendant.            )
     _____)   Zoom Videoconference
9

10         TRANSCRIPT OF PROCEEDINGS - MOTION HEARING (Doc. 190)
        DEFENDANTS' JOINT MOTION TO EXCLUDE GOVERNMENT'S EXPERT
11    WITNESSES OR IN THE ALTERNATIVE TO HOLD A DAUBERT HEARING
             BEFORE THE HONORABLE WILLIAM P. JOHNSON
12              CHIEF UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:   LETITIA SIMMS
                          JACK BURKHEAD
15                        UNITED STATES ATTORNEY'S OFFICE
                          District of New Mexico
16                        Post Office Box 607
                          Albuquerque, New Mexico   87103
17
     For the Defendant:   CARTER B. HARRISON, IV
18                        HARRISON & HART, LLC
                          924 Park Avenue, S.W., Suite E
19                        Albuquerque, New Mexico  87102

20                        MARSHALL J. RAY
                          LAW OFFICES OF MARSHALL J. RAY, LLC
21                        201 12th Street, N.W.
                          Albuquerque, New Mexico  87102
22

23   Reported by:         MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                          United States Court Reporter
24
          Proceedings reported by machine shorthand and transcript
25   produced by computer-aided transcription.

I N D E X

Page

CLOSING ARGUMENT BY MS. SIMMS ......................114

CLOSING ARGUMENT BY MR. HARRISON ...................117

CLOSING ARGUMENT BY MR. RAY .........................119

REBUTTAL ARGUMENT BY MS. SIMMS .....................123

W I T N E S S E S

Page

DR. KIMBERLY MEHLMAN-OROZCO

    DIRECT EXAMINATION BY MS. SIMMS ....................6

    CROSS-EXAMINATION BY MR. HARRISON .................35

    QUESTIONS BY THE COURT .............................71

    REDIRECT EXAMINATION BY MS. SIMMS .................76


HSI SPECIAL AGENT MORGAN LANGER

    DIRECT EXAMINATION BY MS. SIMMS ...................80

    CROSS-EXAMINATION BY MR. RAY ......................97

    QUESTIONS BY THE COURT ............................111

    REDIRECT EXAMINATION BY MS. SIMMS ................113

* * * * *

1  (In Open Court at 9:35 A.M.)

2          THE COURT:  This is United States vs. Matthew Woods,

3  Case No. 17-CR-1235.  Would counsel enter their appearances for

4  the record, please.

5          MS. SIMMS:  Letitia Simms and Jack Burkhead on behalf

6  of the United States.

7          MR. HARRISON:  Carter Harrison and Marshall Ray on

8  behalf of the Defendant, who is also here on the line with us.

9          THE COURT:  I'm having trouble hearing you.  There

10  seems to be like an echo.

11          MR. HARRISON:  Is this better?

12          THE COURT:  Yes, a little better.  Are counsel for

13  the United States able to hear Mr. Harrison?

14          MS. SIMMS:  I can't really hear him.

15          MR. BURKHEAD:  Very faint.

16          THE COURT:  Go ahead, Mr. Ray.  Would you enter your

17  appearance?

18          MR. RAY:  Yes, Your Honor.  Marshall Ray and Carter

19  Harrison.  We're present on behalf of Mr. Matthew Woods.

20          I also wanted to go ahead and put on the record,

21  Judge, that Mr. Woods has signed a Waiver of Personal

22  Appearance to appear by video for today's hearing, and that was

23  filed on the docket.

24          And I would also add one thing.  Carter, you sounded

25  really good and clear a few minutes ago.  Maybe something

 1  changed, like a setting.

 2          MR. HARRISON:  My microphone was turned down.  Am I

 3  heard a little better right now, or am I still faint?

 4          THE COURT:  That's a little better, but you're still

 5  kind of muffled.  I can hear Mr. Ray very clearly.

 6          MR. HARRISON:  Okay.

 7          THE COURT:  And I'm looking at the Waiver of Personal

 8  Presence, Document 486, so I'll make the finding that Mr. Woods

 9  consents to this matter proceeding by way of video

10  conferencing.

11          And Mr. Woods, are you able to hear us, sir?

12          THE DEFENDANT:  Yes, sir, I am.

13          THE COURT:  Were you able to hear your attorney,

14  Mr. Harrison?

15          THE DEFENDANT:  Very vaguely.

16          THE COURT:  Okay.  Anyway, I guess we'll get started,

17  and hopefully whatever the technological issue is on

18  Mr. Harrison's end can be fixed.

19          Now, the matter that's set this morning, the original

20  motion was to exclude the testimony of several Government

21  expert witnesses, Dr. Kim Mehlman-Orozco, Wolbert Burgess, and

22  Sergeant Matthew Vollmer.  I think that was originally filed by

23  counsel for Mr. Galloway, and Mr. Woods' counsel have joined in

24  it or supplemented it, right?

25          MR. RAY:  That's correct, Your Honor.

 1           THE COURT:  So who is going to be handling this for

 2   the United States?

 3           MS. SIMMS:  I will, Judge.

 4           THE COURT:  Are we talking about three witnesses or

 5   two witnesses?

 6           MS. SIMMS:  We're talking about two witnesses.  The

 7   United States is not calling Ms. Burgess, or Ms. Wolbert.  We

 8   will only be calling Ms. Mehlman-Orozco, and then as discussed

 9   a while back with counsel, we have substituted Special Agent

10   Morgan Langer for Sergeant Vollmer.

11           THE COURT:  Okay.  So how do you want to proceed,

12   Ms. Simms?  Do you want to proceed with testimony now?

13           MS. SIMMS:  Yes, Your Honor.

14           THE COURT:  Go ahead.  You may call the first

15   witness.

16           MS. SIMMS:  We will call Dr. Kimberly Mehlman-Orozco.

17           THE COURT:  And I'll ask Dr. Orozco to raise your

18   right hand and the Clerk of the Court will place you under

19   oath.

20       (DR. KIMBERLY MEHLMAN-OROZCO, GOVERNMENT WITNESS, SWORN)

21           THE COURT:  You're on mute.

22           THE WITNESS:  Yes, sir, I do.

23           MR. GARCIA:  Thank you.

24           THE COURT:  Ms. Simms, you may proceed.

25

1                      DIRECT EXAMINATION

2    BY MS. SIMMS:

3    Q.   Dr. Mehlman-Orozco, will you tell the Court about your

4    educational background, please?

5    A.   Sure.  I have a Bachelor of Science degree in

6    Administration of Justice where I graduated Cum Laude from

7    George Mason University, a Masters degree also from George

8    Mason in Justice, Law and Crime Policy, and a Ph.D. also from

9    George Mason in Criminology, Law and Society.

10   Q.   Will you repeat what your -- Criminology, Law and Society

11   is what you said?

12   A.   A Ph.D., a doctorate.

13   Q.   Okay.  When did you get your doctorate?

14   A.   I turned in my dissertation and was officially conferred

15   my degree around August of 2012, I believe.

16   Q.   And do you have any teaching experience?

17   A.   Yes.  I've taught at my alma mater, at George Mason

18   University, as well as at the number one ranked criminology

19   school in the country, University of Maryland, College Park.

20        Also, many years ago after I graduated with my undergrad,

21   I also taught adult basic education, workplace essential skills

22   and GED classes at our local jail, at Prince William County

23   Adult Detention Center.

24   Q.   Okay.  Do you consider yourself to be an expert witness in

25   any area?

1    A.    Yes, in human trafficking.

2    Q.    What's your training specifically in relation to sex

3    trafficking?

4    A.    I have a -- well, I've participated in quite a few

5    conferences.  I've done training for law enforcement.  I've

6    conducted original research on human trafficking by conducting

7    multiple qualitative interviews, actually hundreds of

8    qualitative interviews with convicted sex traffickers as well

9    as victims of trafficking, commercial sex consumers and

10   consenting sex workers.

11        I've written extensively on the subject; opinion

12   editorials, magazine articles, peer-reviewed journal articles.

13   I've written a book on human trafficking that's actually used

14   to train law enforcement by an organization called Erase Child

15   Trafficking.

16        I've served probably as one of the leading, if not the

17   leading expert witness in criminal cases across the country, as

18   well as civil litigation on human trafficking cases, so I've

19   been qualified in numerous courts to testify.  And I believe

20   I'm the only human trafficking expert witness that is admitted

21   to the Los Angeles Superior Court panel of experts.  Now, this

22   is a panel of experts that judges have deemed qualified to

23   testify on a variety of topics.

24   Q.    And you, as far as you know, are the only one qualified to

25   testify about sex trafficking specifically?

1  A.    I'm the only one admitted to that panel as far as I'm

2  aware, the last time I was told by somebody who hired me off of

3  the panel of experts in Los Angeles.

4  Q.    Okay.  And to get on that panel, do you have to be deemed

5  qualified by a Judge?

6  A.    Yes.  I believe it's a panel of Judges.

7  Q.    Okay.  And they have qualified you and you are on that

8  panel; is that correct?

9  A.    Yes, ma'am.

10  Q.    How many times have you testified in federal court as an

11  expert witness in sex trafficking?

12  A.    A lot of cases, they plea out prior to me giving

13  testimony.  I believe I've testified -- I want to say it was

14  federal court, but I don't recall exactly, in a Frye motion for

15  another expert in York, but most recently I testified actually

16  for the defense in a federal court case in Harrisburg,

17  Pennsylvania.  So I think once, that I'm confident about, I

18  actually testified and qualified in court, but I'd have to

19  check.

20  Q.    Have you testified in state court as an expert in sex

21  trafficking?

22  A.    Yes.  I've testified in Contra Costa County, Santa Clara

23  County, and obviously Los Angeles County.  I passed and went

24  through the Daubert process in a case that was in Richmond.  It

25  didn't end up going to trial, but I was admitted.  I mean, I

1   passed and successfully prevailed in that Daubert hearing.

2   Let's see.  I think -- so probably a half dozen times or so

3   that I've testified actually in a trial in state court.

4   Q.   Okay.  Now, you were telling us a little bit about some of

5   the research you've done into sex trafficking, and based on

6   some of that you've actually written and published a book; is

7   that correct?

8   A.   Yes, a book, and several peer-reviewed journal articles,

9   as well.

10  Q.   Now, I want to ask you about that, but I would like you to

11  tell the Court about what kind of education and training you

12  have regarding conducting, you know, like a formal scientific

13  study into something like sex trafficking.

14  A.   I mean, George Mason University, the department that I was

15  in, was very quantitative and empirical in nature, so I was

16  trained on both qualitative and quantitative research methods.

17  While I was a student there, I served as a lead clinical trial

18  search coordinator for the Cochran Justice Health Field, which

19  is one of the leading organizations that aggregate data on

20  trafficking -- or excuse me, aggregate data on criminology.  So

21  I'm trained in systematic reviews and metanalyses.

22      I served as a research associate for the Trinidad and

23  Tobago Crime Reduction Project, which was a multi-million

24  dollar study that conducted surveys of law enforcement and

25  community members.  So I'm very well-versed and trained in

1   survey methodologies, quantitative data analysis, including

2   aggression models, as well as qualitative data, which human

3   trafficking, because of the nature of the crime, it's very

4   clandestine and hidden and it's something that you don't see a

5   lot of quantitative data on.  For example, one of the leading

6   data collections on crime in the United States is the FBI

7   Uniform Crime Report.  They didn't even have a data point on

8   human trafficking until 2013, a year after I had graduated, and

9   even those data are very limited in nature because of how

10  hidden and difficult to identify these cases are.

11      So I'm very well trained not only in my academic program,

12  but I've kept up-to-date on the leading research methods in my

13  field through attendance in conferences and reading of

14  peer-reviewed journal articles on the subject at hand.

15  Q.   And just to make sure we're all following, when you say

16  quantitative data, what are you referring to?

17  A.   Quantitative data is generally referring to data that is

18  -- you have a number of data points.  You have more data points

19  to analyze, and you can analyze it in a way that's focusing on,

20  for example, prevalence on prediction models, on the

21  relationships, correlation or causation between variables.

22  These are quantitative studies that focus on more often than

23  not more than a hundred data points where you're trying to

24  create predictions on a certain model.

25      Qualitative is more describing, describing a phenomena.

1    Studying fewer cases, but going more in-depth.  So in-depth

2    interviews where you're identifying themes and have more of a

3    description of why something happens as opposed to -- or what

4    it looks like, as opposed to predictions between, you know, an

5    independent variable and a dependent variable.  Does that make

6    sense?

7    Q.    Yes.  So it's fair to say that you've been trained quite

8    extensively in how to collect and analyze data in different

9    areas; is that correct?

10   A.    In particular criminological data, yes.

11   Q.    Okay.  And when you wrote and published the book, Hidden

12   in Plain Sight, you used that past training and experience to

13   research the content of the book?

14   A.    Yes, but predominantly focusing on qualitative methods

15   because of the derth of quantitative data on human trafficking.

16   So conducting the extensive interviews that I did, but also

17   content analysis of the available case law on human

18   trafficking.  There's not that many cases, but at the time the

19   Michigan Law Center Human Trafficking Database had a rather

20   robust compilation of human trafficking cases for me to review.

21   So it involved, more or less, a focus on qualitative data

22   collection as opposed to quantitative.

23   Q.    So in your research, did you do like an extensive review

24   of the case law that is out there about sex trafficking?

25   A.    Yes, absolutely.  So, looking at themes across those

1   cases, but also looking at those cases in relation to extant

2   data and extant research on trafficking.  So for example, Joan

3   Reid is a researcher and academic down in Florida who has

4   published similar qualitative studies that found certain

5   themes.  So basically trying to triangulate data sources across

6   multiple outlets.  So looking at peer-reviewed research, what's

7   already out there, where can we fill some gaps.

8       Generally, you know, you do see the same kinds of themes

9   and patterns prevail regardless of the researcher.  So it's not

10  a subjective issue, it's very objective, where you're seeing

11  the replication of findings across researchers.

12  Q.   Now, in your book, you discuss the research that you

13  personally did into the area of sex trafficking; is that

14  correct?

15  A.   Yes.

16  Q.   Can you tell the Court -- I kind of want to break it up

17  into segments.  But can you tell the Court, did you interview

18  people that had been convicted of sex trafficking?

19  A.   Yes.

20  Q.   Approximately how many people who have been convicted of

21  sex trafficking did you either interview or correspond with in

22  some way?

23  A.   Again, it wasn't that many.  It was probably a half dozen.

24  But those interviews -- there were thousands of interviews over

25  the course of multiple years, and the reason why that's

1    important is because the initial interactions -- and this was

2    something that not only did I publish in my book, but it was

3    also in the peer-reviewed journal article that was published in

4    the academic journal on trafficking schemes and methods of

5    coercion used to recruit and control victims.  But in those

6    thousands of interviews over the course of time, you can see

7    that the initial interactions, the initial questions asked to

8    traffickers, their answers change over time showing a

9    difference between their projected identity versus their true

10   identity, which helps facilitate recruitment and control.

11   Q.   Okay.  Can you explain a little more that last part that

12   you said?  How does that -- well, you know what, I'm going to

13   get into that later.  I first kind of want to keep talking

14   about the research that you did.

15       So, is it fair to say that you had communications with

16   approximately a half dozen individuals that had been convicted

17   of sex trafficking, but you had numerous communications with

18   those individuals?

19   A.   Yes, that's correct.

20   Q.   How did you find these people to talk to?

21   A.   The Michigan Law Center Human Trafficking Database.  The

22   review --

23   Q.   So you used that database --

24   A.   That was my sampling frame, the Michigan --

25   Q.   I'm sorry, I think I --

1              THE COURT:  Do this again.  Restate the question,

2  Ms. Simms.

3              MS. SIMMS:  Okay.

4  BY MS. SIMMS:

5  Q.   How did you find these people that had been convicted of

6  sex trafficking?

7  A.   I used the Michigan Law Center Human Trafficking Database

8  as my sampling frame.  So essentially, I looked at extant case

9  law and I sampled from that on who to interview and who to --

10  basically, see if they wanted to be interviewed, as well.

11  Q.   And how many people did you reach out to?

12  A.   Again, this was a few years ago, so I would say probably

13  about two dozen.  So the nonresponse rate was rather high.  But

14  again, this was more of a qualitative study.

15  Q.   And did you contact them when they were in custody or in

16  prison?

17  A.   Yes.

18  Q.   After their conviction; is that right?

19  A.   Yes, that's correct.

20  Q.   And out of the ones that did agree to communicate with

21  you, what kind of information did you seek to get from them?

22  A.   It was really a grounded theory approach to research.

23  There really wasn't -- so the themes sort of developed

24  organically from the interviews.  Initially the first set of

25  questions were just general, asking about their background, why

1  they did what they did, and so there was a very loose

2  open-ended response.  But then it flowed from there, and that's

3  called a grounded theory approach in qualitative data

4  collection.

5      So really, the data was mined.  There wasn't necessarily a

6  set hypothesis or objective that I was trying to confirm, it

7  was really just better understanding how these individuals

8  perceived themselves, perceived the offenses that they were

9  convicted of, and through that it really just took its own

10  direction based off of the information they provided.

11  Q.   Okay.  Based on the information they provided, were you

12  able to -- I mean, did it coincide or did it corroborate some

13  of the other research you had done regarding sex trafficking?

14  A.   It did in part, but more so it corroborated what other --

15  I mean, it did, but it also corroborated what other researchers

16  in the field had also found.  So as I had mentioned previously,

17  Joan Reid and her study on the recruitment and control schemes

18  that are used by traffickers, she also did a qualitative small

19  sample size study, and I found similar tactics, similar

20  findings that really did corroborate some of the things that

21  she found and discussed in her peer-reviewed journal article on

22  the same topic.

23  Q.   Now, in your research, have you had an opportunity to

24  speak with victims of sex trafficking?

25  A.   Yes.  Not only in my --

1  Q.   Approximately how many -- go ahead.

2  A.   Sorry.  I was just going to say, not only in my research,

3  but also in my work as an expert witness.  I've interviewed

4  victims in that capacity, as well.

5  Q.   Approximately how many do you think you've spoken with?

6  A.   Honestly, I don't want to say a number because I don't

7  know off the top of my head, but it was certainly more than the

8  number of convicted sex traffickers that I've interviewed.  So

9  I would say a couple of dozen.  But the number of times that I

10  interviewed them were less, as well.  So I would probably say

11  I've interviewed victims a couple hundred times as opposed to

12  the thousands of interviews I've done with the handful of

13  convicted traffickers.  So there's more people that I

14  interviewed, but the interviews were fewer.

15  Q.   And from what you learned from victims of sex trafficking,

16  did that corroborate the studies, the other studies that you've

17  read or that you know of that have been done?

18  A.   Yes, absolutely.

19  Q.   Have you had an opportunity to speak with customers of

20  prostitutes?

21  A.   I wouldn't be able to determine whether the commercial sex

22  consumers were the customers of consenting sex workers or

23  victims of trafficking, because most of them perceive the women

24  they procure services from as consenting, adult consenting

25  women.  So they don't perceive them as victims.

1          But the commercial sex -- I have done a number of

2    interviews with commercial sex consumers.  I would probably say

3    also several dozen, probably three dozen, and also a minimum of

4    hundreds of interviews; plural hundreds.

5    Q.   Okay.  In all of this research, are you able to form

6    opinions about how the sex trafficking industry generally

7    works?

8    A.   Yes.

9    Q.   Have you done any -- let me make sure I'm covering my

10   bases here.

11         Now, we talked kind of loosely -- we referred specifically

12   to your book that you've published, but your resumé has several

13   other publications.  They're not numbered.  Can you tell me how

14   many published pieces you've done about sex trafficking?

15   A.   I mean, I've published probably two or three dozen

16   opinions or editorials on human trafficking that have been seen

17   in outlets such as the Washington Post, the Baltimore Sun,

18   USA Today, Politico, Thomson Reuters.  I'm sure I'm missing

19   some.  I've been interviewed by those same outlets, as well as

20   others.  I've been on CNN, NBC, CBS talking about trafficking

21   and trafficking trends.

22         I have only like three or four peer-reviewed journal

23   articles at this point.  One is in Trends in Organized Crime.

24   I believe another is in a human trafficking related journal,

25   Social Inclusion.  I've served -- in addition to that, I've

1  served as a peer reviewer for these journals, as well as for

2  grant applications for anti-trafficking organizations, because

3  of my expertise.  I've published my book, Hidden in Plain

4  Sight, as well as a couple of magazine articles.

5       So all together I would say, I don't know, maybe 40

6  articles or 40 publications are on my CV, something around

7  there.

8  Q.   Okay.  Do you ever train law enforcement?

9  A.   Yes.

10  Q.   Can you tell the Court about that, please?

11  A.   So, my book has been used by -- well, first, I guess

12  there's two components to that.  One, my book has been used as

13  a manual by other organizations to train law enforcement in

14  New York and North Carolina, I believe in Florida.  The

15  organization is called Erase Child Trafficking, and they use my

16  book as sort of a manual for the training of police officers.

17       I personally have trained police.  The Royal Canadian

18  Mounted Police in Halifax, Canada, they called me up there.

19  I've most recently been contacted by a -- I believe it was a

20  prosecutor who was coordinating a training of police in

21  California.  I don't remember the jurisdiction.  But I have

22  done maybe like a handful of trainings of law enforcement.

23       Also, before I forget, to that effect, part of that

24  training involves me serving as like an invited panelist in

25  conferences.  So for example, the Police Executive Research

1    Forum, PERF is the organization, the Police Executive Research

2    Forum, I believe a year ago or so they had a human trafficking

3    conference.  I was an invited panelist to educate the attendees

4    and the other people on the panel on my expertise and the work

5    that I do, and there was a report that came out of that.  So I

6    think that falls into police training, as well, the attendance

7    of these conferences and exchange of information there.

8    Q.   Let me ask you, in all of your research that you've done

9    and everything else that you've read on this topic, what you

10   know about the sex trafficking industry, is it different from

11   what the public is often fed through movies or other media?

12   A.   Absolutely.  Not just very different from what is in the

13   movies, but what is in mainstream media.  There is a lot of

14   misinformation.  That's part of the reason why I take it upon

15   myself to publish so often in publicly available media outlets,

16   to correct this misinformation and to provide more real

17   accounting of the human trafficking topic and issue.

18        There is a lot of -- even people who purport to be experts

19   within the field have a huge misunderstanding of how this crime

20   actually happens.  And I can give some concrete examples, if

21   you'd like.  But it's a systemic issue.

22   Q.   Yes, can you give an example of what maybe has come out in

23   the media that may not be an accurate description of the sex

24   trafficking industry?

25   A.   So, one example is -- and this is something that other

1  purported experts have this mistake, as well.  So under the

2  Trafficking Victims Protection Act, which is the major federal

3  piece of legislation that defines what human trafficking is,

4  human trafficking is generally described as the use of force,

5  fraud, coercion, deception, threat for the purpose of

6  exploitation, or the exploitation of anyone under the age

7  of 18.  Now, that last part is important, the exploitation of

8  anyone under the age of 18.  If you speak to most experts, and

9  you hear this all the time in the media, there's no such thing

10  as a child prostitute.  There's no such thing as a minor who's

11  engaged in sex work.

12      Now, while the recommendations are there and no child

13  should be treated as a sex worker, and from the definition,

14  consent is not an affirmative defense to a minor involved, the

15  reality is that kids, minors, are quite often misidentified and

16  erroneously criminalized.  I published a peer-reviewed journal

17  article that looked at data from the Office of Juvenile Justice

18  and Delinquency Prevention on the number of arrests for

19  commercialized sex of minors, and they are being arrested.

20  There is case law out there of kids being prosecuted for

21  prostitution when that is counter to what other experts believe

22  should be happening and what they educate the public on what is

23  happening.  So I think, one, the rate and reality on the

24  erroneous criminalization of victims is something that is a

25  systemic issue.

1    Two, how human trafficking happens.  I speak to so many

2    different media outlets and people and conferences and just

3    average citizens about this topic, and they think of

4    trafficking as where somebody is being physically kidnapped.

5    And there are actual stories that feed into that.  Case in

6    point, there was a viral story of a woman who was at IKEA and

7    thought that there were sex traffickers going to kidnap her

8    kids.  It went viral.  More often than not, that's very

9    unlikely.  That's not how trafficking happens.  It is not

10   typically through a physical kidnapping or physical force, it's

11   more often than not through coercion, deception, through faux

12   relationships.

13       So I think that those are two really clear examples, but

14   as you can see, I'm a talker and I can give a lot more.  But I

15   think that gets my point across sufficiently.

16   Q.   Have you ever seen media portrayals that glamorize

17   pimping?

18   A.   Yes.

19   Q.   That glamorization, is that an accurate portrayal of the

20   sex trafficking industry, in your opinion?

21   A.   Well, first, it's important to draw a distinction between

22   pimping/pandering and sex trafficking, although there's a lot

23   of overlap between the two.  A true pimping relationship, if it

24   is only pimping and pandering and not sex trafficking, it is

25   involving a consenting adult who is not being exploited.  But

1 more often than not, pimping relationships fall better into the

2 category of sex trafficking.

3     It is not something that is glamorous in the sense of

4 being a victimless crime.  The woman or the man who is being

5 commercially sexually exploited, who is being deceived, who is

6 being coerced and exploited in this industry, it is a very

7 tough and hard life.  It's very difficult to escape.  And, in

8 fact, victims find themselves in sort of a cyclical either

9 revictimization or erroneous criminalization after they've

10 gotten out of the situation, if they are able to get out of it.

11     So the media depiction of it I think is different than

12 reality, although there are some, I guess, links between terms

13 that are used, between dress and kind of some of the other, I

14 guess, popularized aspects of the pimping/pandering dynamic.

15 Q.   Have you researched trauma bonding?

16 A.   Yes.

17 Q.   Can you tell the Court what that means?

18 A.   So, trauma bonding is -- well, there's sort of a misnomer

19 that it's a psychological phenomena when it is absolutely not.

20 It was borne out of sociology.

21     But in any event, it is, I think, akin, or a lot of people

22 liken it to a Stockholm-type syndrome, where a victim is

23 coerced and deceived, in a way, in a trafficking situation or a

24 trafficking dynamic where they have a positive affinity or they

25 have an emotional bond with their trafficker, making it

1  difficult for them to leave, making them sometimes

2  uncooperative with law enforcement and interventions, and

3  really inhibiting any type of external entity from breaking up

4  that dynamic.  So it's a phenomenon that we see in trafficking

5  that really bonds and ties a victim to an offender in an

6  emotional and sociological way.

7  Q.   Can a trauma bond be a reason that you would see a sex

8  trafficking victim return to their sex trafficker over and over

9  again?

10  A.   Absolutely.

11  Q.   Is this a concept -- do you know whether the general

12  public realizes that trauma bonding exists?

13  A.   In my experience, if they do understand it, it's a very

14  superficial understanding and they still are left with the

15  question, if you are physically without your trafficker, why

16  didn't you run away?  If you had a phone, why didn't you call

17  for help?  And the trauma bond really does help explain that

18  dynamic and explain that nuance to sex trafficking crimes in

19  particular.

20  Q.   Now, a member of the general public who just doesn't have

21  any experience with these themes -- well, let me rephrase this.

22      In your research, in your experience, are you aware of

23  whether or not there are certain people who are at higher risk

24  of being trafficked?

25  A.   So, the way that I describe it in my book, risk is really

1  associated with having a void in meeting a basic need.  So I

2  use Maslow's hierarchy of needs, right.  At the very base level

3  is somebody who is [audio distortion] --

4          THE COURT:  I'm sorry; I didn't hear what you just

5  said.

6          THE WITNESS:  I apologize.

7          THE COURT:  It was in connection with the base level,

8  and I couldn't make out the rest of what you said.

9  A.    Okay.  So using Maslow's hierarchy of needs, at the very

10  base level, people seek to have their physiological needs met.

11  So food, shelter, water.  So somebody who is food insecure, or

12  housing insecure, or is a runaway or homeless, right, they have

13  a problem meeting those basic needs.  At the next level, people

14  seek safety.  After that, love and belonging.  After that,

15  esteem.  And after that, self-actualization.

16      What a trafficker does is, essentially he's looking for an

17  individual who has a void in meeting one of those needs.  I

18  would say somebody who has a difficult time meeting those basic

19  physiological needs, those basics of food, shelter, water,

20  they're at higher risk.  It's easier to just make the false

21  promise to fill that void.

22      But a young girl who has a low self-esteem, or who has

23  issues with love and belonging, or safety, maybe a victim of

24  childhood sexual abuse, or have safety issues at home or in

25  school or in her personal life, all of these people are at risk

1  of being trafficked, it's just a matter of whether the

2  trafficker has the skill to be able to recruit and control that

3  individual.

4  BY MS. SIMMS:

5  Q.   In your research and experience, can you testify about the

6  methods that sex traffickers use to recruit their victims?

7  A.   Absolutely.  And I have multiple times.

8  Q.   Okay.  And then, I'm just going to kind of go over the

9  breadth of your proposed testimony.

10       Are you aware of common reactions that women have to being

11  trafficked?

12  A.   Yes, and the reality is, much of it falls into kind of a

13  rape trauma syndrome symptomology.  So they're recalcitrant to

14  interventions, they can maybe say something and retract that

15  information, they can find themselves engaging in dysfunctional

16  sexual relationships, even after they've been rescued, or find

17  themselves engaging in survival sex.  So I definitely can and

18  have the experience of testifying on the reactions and what

19  happens after somebody has gone through a trafficking

20  situation.

21  Q.   Can you tell the Court, what is survival sex?

22  A.   Survival sex is when somebody who is either out of a

23  trafficked situation or is homeless or a runaway, when they

24  engage in commercialized sex, not because it's something they

25  want to do or they're consenting to it, but it's something they

1  need for basic survival.  So they're just trying to survive and

2  they feel like that's all they can do.

3  Q.   Based on your expertise, could you testify why -- and I'm

4  using women specifically as an example, but are men also sex

5  trafficked?

6  A.   Yes.

7  Q.   Could you tell the jury, though, like in this case, why

8  would a woman or a victim stay with a violent trafficker?

9  A.   Absolutely.  And I think that also does lend into the

10 trauma bonding as well as the research that's been done on

11 domestic violence type of situations.  Why does a woman stay?

12 Why is sometimes the cyclical form of violence a very strong

13 indicator of the bond or trauma bond between that victim and

14 her offender?

15     So I definitely think it kind of aligns with the studies

16 that I've seen, the cases that I've reviewed, as well as my

17 experience in interviewing survivors as well as traffickers,

18 the commonality of someone staying, a victim staying in a

19 situation even when violence exists, or conversely, when

20 violence is absent of the dynamic.

21 Q.   Can you testify on the subject of whether or not

22 traffickers sometimes reward the people that they're

23 victimizing?

24 A.   Yes.  Again, using my qualitative research, my review of

25 case law, we do see that happen with frequency.  Not only are

1   they rewarded with gifts, such as clothing or jewelry or other

2   personal possessions, but also just treatment.  So getting your

3   nails done, getting your hair done.  I've even seen a case

4   where plastic surgery was provided.  All of this is not

5   necessarily because it's a true reward, per se, but it is a

6   method used to keep a victim or survivor compliant to the

7   exploitation and in an exploitive dynamic.

8   Q.   So while traffickers will sometimes reward, you know, as a

9   means of manipulation -- you referred to, you know, allowing

10  them to have their hair done or their nails done -- can that

11  serve another purpose in the overall trafficking scheme?

12  A.   Absolutely.  It helps increase the profit margin.  I mean,

13  if you're having somebody who is more presentable, who has an

14  appearance that's more sellable, they're going to make more

15  money.  So that's not in any way to benefit the victim, it is

16  to make her more -- to help her get the trafficker more money,

17  more clientele.

18  Q.   In your research, are you aware of the concept of debt

19  servitude?

20  A.   Yes.  I typically refer to it as debt bondage, but yes.

21  Q.   Can you explain, briefly, debt bondage for the Court?

22  A.   It's just another method, a control method used to

23  continue an exploitation of a victim of trafficking.  So

24  essentially, they are indebting their victim to the trafficker

25  to make him or her feel that she's obligated to continue

1  whatever the form of trafficking may be, and the debt typically

2  gets pushed further and further down the road, or increased

3  after a period of time, to make it more difficult to pay off

4  that debt.

5      So for example, let's say that the individual is initially

6  understanding that she would have to pay back a thousand

7  dollars within three years.  That three years suddenly becomes

8  five years or six years because the debt increases.  So there's

9  always something that increases the amount of money that's owed

10  to the trafficker, or typically that's what we see.

11  Q.   Have you ever heard of multiple traffickers working

12  together or with one another, like in a loose organization?

13  A.   Yes.

14  Q.   Do certain traffickers in an organization like that have

15  differing roles?

16  A.   They can.  I've seen the dynamic of a mentor and a mentee.

17  I've seen the dynamic of competitors, as well.  But also, just

18  seeing individuals work together that maybe might be on the

19  same playing field, but when a victim perhaps could become

20  recalcitrant to one, she might be more susceptible to the

21  other.  So there's this idea or concept of choosing up or going

22  to another trafficker, going to another person, to make them

23  more -- I guess lengthen the exploitation.  So if a victim is

24  getting ready to run away or feels like she wants to leave,

25  putting that second person in, and they would trade people in

 1 || their trafficking scheme to work together in that regard.

 2 || Q.    Have you ever seen a dynamic, like a good cop/bad cop

 3 || dynamic, with traffickers that work together?

 4 || A.    Yes, absolutely.

 5 || Q.    Are you aware whether or not there are different kinds of

 6 || traffickers?

 7 || A.    Yes, there definitely are.

 8 || Q.    And do they use different means to exploit their victims?

 9 || A.    Yes.  And I talk about this both in my book and in one of

10 || my peer-reviewed journal articles, the different typologies of

11 || trafficking.  It's not just me, as well.  Other experts and

12 || other researchers have found these different types of

13 || recruitment and control methods where they have termed

14 || different types of sex traffickers.

15 ||      So for example, in one of my interviews, there were

16 || actually different types laid out by the trafficker, himself,

17 || where he discussed the type of a gorilla pimp, or somebody

18 || who's more heavy-handed with violence and physical force,

19 || compared to a Romeo style of pimping or sex trafficking where

20 || they are more using romantic relationships.  Those are two very

21 || different dynamics, but oftentimes you'll see those dynamics

22 || work together, because the heavy-handed gorilla style of

23 || pimping can be more difficult to sustain for longer periods of

24 || time with multiple victims, and that's why you have the Romeo

25 || style of sex trafficker or pimp who is there using more

1    coercion, romantic relationships and deception.

2       But I think that these different types of pimping and sex

3    trafficking, they have been replicated, these qualitative

4    findings, across researchers and are very clear in the case law

5    on this topic, as well.

6    Q.   Can you testify about whether age plays a role in a

7    Victim's level of vulnerability?

8    A.   Yes.  So, typically the research out there suggests that

9    younger victims are more susceptible to deception.  They're

10   less able to determine whether they're being deceived and

11   manipulated.  But that doesn't mean that it can't happen to an

12   older victim, as well.  But certainly younger victims are an

13   easier target for recruitment and control in sex trafficking

14   schemes.

15   Q.   Can you testify as to whether a parent sometimes allows

16   this to happen to their children?

17   A.   Whether parents allow trafficking to happen to their

18   children?

19   Q.   Yes.

20   A.   Yes.  And sometimes parents are the actual trafficker.

21   Q.   Would you be able to educate a jury on how it might affect

22   a child when their parent is involved, differently than it

23   would affect, you know, another victim?

24   A.   I would not be able to testify on that.

25   Q.   Okay.  Can you give testimony as to whether traffickers

1  require to have sex with their victims, themselves?

2  A.    Typically, yes.

3  Q.    What are the reasons that traffickers would have sex with

4  the victims themselves?

5  A.    I mean, it really depends on the type of trafficker.  A

6  violent gorilla style sex trafficker or pimp might do it to

7  show his dominance; to really, I mean, physically rape and

8  traumatize a victim.  In that way, a Romeo style of pimp or sex

9  trafficker would do it to create an emotional bond and to

10  create an emotional tie, both physical, sexual and emotional,

11  in a way to make their victim feel like they are in that

12  consenting sex relationship, a romantic relationship.

13  Q.    Okay.  In your opinion, is there a stigma regarding

14  engaging in prostitution?

15  A.    Absolutely there's a stigma associated with sex work, and

16  I think that there's a huge group of women who are working to

17  change that, who are consenting sex workers.  But still, there

18  is a large stigma associated with it, and you do find, in

19  particular, survivors of sex trafficking being very embarrassed

20  and feeling judged by their own victimization, which isn't

21  considered sex work.  That's considered sex trafficking.  But

22  nevertheless, because of the sex work associated stigma, there

23  is definitely an emotional dynamic associated with that that

24  also feeds into the rate of underreporting.

25  Q.    I didn't catch the last part.  It feeds into the rate of

1  what?

2  A.    Underreporting.  So a victim of trafficking might not

3  report her victimization because of that associated stigma, or

4  perceived stigma.

5  Q.    Okay.  Have you ever spoken with a trafficker who told you

6  that he or she was just trying to help their victims?

7  A.    Yes.

8  Q.    Can you testify as to whether it's common for a victim to

9  continue contact with their trafficker after their trafficking

10  has ended?

11  A.    Yes, I see that with commonality, and the same dynamic

12  sort of repeats regardless of the type of trafficking because

13  of the trauma bond.

14  Q.    Can you testify as to whether traffickers use the

15  participation of other women to recruit victims?

16  A.    Absolutely.  That also happens with commonality,

17  because -- for a number of reasons, but predominantly it

18  diffuses responsibility.  So when and if a sex trafficker uses

19  another woman or another victim to facilitate the recruitment

20  of other victims, he or she can then point the blame onto that

21  female as a co-conspirator, perhaps the one that should be held

22  responsible for this as opposed to the trafficker themselves.

23  Q.    Can you testify as to whether sometimes it's easier for

24  women to recruit other women?

25  A.    From a -- so, from a quantitative perspective, I

1   definitely wouldn't be able to speak on that, but qualitatively

2   speaking, it does appear to happen more frequently than not.  I

3   don't feel comfortable to say statistically whether it's easier

4   or harder, but from a qualitative perspective, because of the

5   commonality, it does appear that it would possibly be easier.

6   But I really can't speak from a researcher perspective on that.

7   Q.   In your research, have you ever come across traffickers

8   who are basically born into this sex trafficking industry?

9   A.   Yes.  Actually, that also is more frequent than not.  I

10  talk about that in my peer-reviewed journal article, Protective

11  Heros and Self-Perceived Manipulators.  So these guys project

12  themselves as heroes, as rescuing their victims, but if you

13  look at their background, they oftentimes are the children of

14  consenting sex workers or sex traffickers.  Or sometimes they

15  were, you know, sexually assaulted at a young age, as well, and

16  it was just sort of a means to an end.  They saw it better than

17  and there was less risk associated when compared to the sale of

18  drugs.

19  Q.   Are you familiar with the terminology used in the sex

20  trafficking industry?

21  A.   Yes.

22  Q.   Is that terminology something that you believe the general

23  public is familiar with?

24  A.   No, it's not something the general public is familiar

25  with.  In fact, a lot of police agencies aren't as familiar

1   with it, as well, depending on how extensive their human

2   trafficking training is.

3       Also, it's something that's not stagnant, it evolves, and

4   they attempt to really circumvent detection with the evolution

5   of these terms.  And it also can be geographic.  Depending on

6   where you are, they might use different terms and acronyms to

7   describe similar dynamics or sexual exchanges or people.

8   Q.   Okay.  Do you think there's anything else that I've missed

9   about your background or training that is pertinent to your

10  expertise in the area of sex trafficking?

11  A.   No, I don't think so.  I think we covered most of it.  My

12  education, my training of law enforcement, my publications, my

13  prior expert witness testimony.  I think we've covered all

14  bases.

15          MS. SIMMS:  Okay.  Just one second, Judge.  I will

16  pass the witness, Your Honor.

17          MR. HARRISON:  First I want to check and see [audio

18  distortion] --

19          THE COURT:  We're still having problems with the

20  audio.  I just can't hear you, Mr. Harrison.  I'm thinking

21  maybe we ought to take just a real short break, and maybe you

22  can log off and try to log back on and let's see if we can --

23  because I can't hear you, and I doubt Mr. Woods can hear you,

24  and I doubt the witness is going to be able to hear you in

25  order to be able to respond to your questions.  So let's take a

1  short break, and then try to log back on and let's see if that

2  fixes the problem.

3  (Recess was held at 10:36 A.M.)

4  (In Open Court at 10:45 A.M.)

5          THE COURT:  Let's go ahead and go back on record.

6  Mr. Harrison, you may cross-examine the witness.

7          MR. HARRISON:  Certainly.

8                      CROSS-EXAMINATION

9  BY MR. HARRISON:

10 Q.   Good morning, Doctor.  What records have you reviewed in

11 preparation for this case?

12 A.   I haven't reviewed any, or at least not to my knowledge.

13 I know that I was contacted a while ago about the co-defendant,

14 but none to my knowledge.

15 Q.   Okay.  So you don't know anything about Matthew Woods; is

16 that correct?

17 A.   That is correct, sir.

18 Q.   Okay.  Or Cornelius Galloway, who is another co-defendant

19 in this case?

20 A.   That is correct.  But I do believe a year or two ago, I

21 did get something.  But I don't recall anything in particular.

22 Q.   Okay.  I'm just establishing that you understand you're

23 here to give general principles, not any real opinion on the

24 facts of this case; is that correct?

25 A.   Yes, sir, that is correct.

1   Q.   And has that been what you've done in the past in your

2   expert testimony?

3   A.   Generally speaking, yes.  I mean, I think everybody is

4   aware I cannot determine whether somebody is a victim or

5   somebody isn't a victim, or somebody is an offender or not, in

6   the course of serving as an expert.

7        However, with my civil cases, rather, I do generally

8   review the facts of those cases.  So for the civil cases, I do

9   review the facts of those cases very extensively, and

10  essentially the opinions that I render are whether the facts of

11  those cases are consistent with my research and other cases

12  involving trafficking.

13  Q.   You mentioned -- I think this might be a minor correction.

14  You mentioned a New York case that I believe you described as a

15  federal case in which you went through a Frye hearing.

16  A.   I was not Dauberted or Fryed.  It was another person that

17  was under a Frye motion, and I went to testify for the

18  prosecution on basically whether the principles that she was

19  discussing were sort of consistent with my research and

20  experience or not.

21  Q.   Gotcha, okay.  So, I'm going to -- have you reviewed --

22  the Government, on your behalf, filed a disclosure, a Notice of

23  Intent to Call Expert Witnesses.  Have you seen that?

24  A.   It might have been sent to me, but I don't remember what's

25  in it, if it was.

1   Q.   Okay.  It's pretty short, so I'm going to go through and

2   just tell you some of the lines and then ask you about them.

3   A.   Okay.

4   Q.   So one of the sentences here, the second sentence after an

5   introduction, is:  "The United States anticipates that she will

6   testify at trial primarily regarding the clandestine nature of

7   human trafficking crimes, and the trauma bond that exists

8   between victims and offenders."  What is the clandestine nature

9   of human trafficking crimes?  What does that mean?

10  A.   In particular, in comparison to other forms of crimes, it

11  is much more hidden, it has a higher rate of misidentification,

12  not only by law enforcement, but also service providers and

13  other professionals in the field.  It is a crime that unlike

14  other forms of crime, it's underreported and, generally

15  speaking, it's so hidden that quantitative data are difficult

16  to come by because of the rate of misidentification.

17  Q.   Okay.  Now, to latch onto something you just said, does

18  that misidentification ever cut in the other direction; i.e.,

19  people thinking that something is sex trafficking when really

20  it's what you'd call sex work, consensual sex work?

21  A.   Yes, I do believe that to some extent there are issues

22  with the sensitivity and specificity of human trafficking

23  indicia, and some of these indicia do lend to false positives

24  or people misidentifying a case as being trafficking when, in

25  fact, they're not trafficking.  And for that reason, a lot of

1    consenting sex workers, they are demanding, quote-unquote,

2    rights, not rescue, because of this misidentification that cuts

3    in the other direction.

4    Q.   And that can include what you've called a pimping

5    relationship, where you have a promoter, but the relationship

6    is not what you would consider to be sex trafficking; is that

7    correct?

8    A.   It can, but I think that if you have somebody well versed

9    on the topic, there's a very clear distinction between

10   pimping/pandering and sex trafficking.  Pimping/pandering only

11   exists when there is consent between two adults and there isn't

12   that element of force, fraud, coercion, deception or threat.

13   So the elements of trafficking just don't exist.

14   Q.   I think the term you used on direct is, more often than

15   not pimping is what you consider to be sex trafficking.

16   A.   Yes, more often than not it is.  Or more often than not

17   the cases that come through the criminal justice system are

18   better identified as trafficking as opposed to

19   pimping/pandering.

20   Q.   Okay.  You've used those two terms.  Is there a difference

21   between pimping and pandering?

22   A.   I use them interchangeably, but pimping is really what I'm

23   talking about here.

24   Q.   What are the hallmarks of consensual pimping?

25   A.   The hallmarks really are, again, it's two adults, people

1   over the age of 18, and then a complete absence of force,

2   fraud, coercion, deception, or threat.  So to give you a clear

3   example, if you had one individual who said, we are going to

4   split the money 50/50 for your work in the commercial sex

5   industry, I will provide security and help give you customers,

6   and we will split that money 50/50, do you agree with that, and

7   then that exact agreement is what comes to fruition and

8   actually happens.  There's no deviation, there's no change of

9   dynamic, there's no change of the expectations or the length,

10  and both parties have the agency to choose and discontinue that

11  agreement at any time.

12  Q.   Okay.  So in your opinion, the terms of a business

13  arrangement, including the division of profits, could

14  themselves constitute sex trafficking?

15  A.   Can you repeat that one more time?

16  Q.   So in your view, an inequitable division of profits could

17  convert a consensual pimping relationship into sex trafficking?

18  A.   No, I don't believe that's what I said.  It's regardless

19  of the division, right, it doesn't need to be 50/50.  It could

20  be 80/20.  It doesn't matter the division percentage.  It is

21  the absence of force, fraud, coercion, deception, threat, or

22  any type of debt bondage, anything used to coerce the

23  individual into that situation.  The complete absence of that

24  is what makes it a truly consenting dynamic, which would fall

25  better into pimping as opposed to sex trafficking.

1        But if any of those other elements exist, the force,

2   fraud, coercion, deception, or threat -- they don't all need to

3   be there, just one of them for the purpose of exploitation.  If

4   they're exploiting -- the word exploitation means unfairly

5   benefiting from somebody else's work.  That does meet the

6   definition of trafficking.

7   Q.    Okay.  So let's explore, I guess, exploitation, which I

8   tend to agree with your terminology, which is someone who is,

9   for whatever reason, in what you could characterize as an

10  inferior bargaining position.  Using that to get more money

11  than would be obtained were the bargaining position of the two

12  parties equal, do you think that dynamics like that can convert

13  a consensual relationship into sex trafficking?

14  A.    The inequitable bargaining positions?

15  Q.    Yes.

16  A.    I don't believe that's what I said.

17  Q.    Let me use an example.  So you would, I assume, agree that

18  a lot of these women who get involved in these schemes come

19  from, say, rough backgrounds, a lot of times preexisting

20  substance abuse problems, histories like that?  Would you agree

21  with that?

22  A.    I mean, they certainly can.  But a lot --

23  Q.    You've seen that before?

24  A.    I've seen that before, but a lot of them don't come from

25  that background, as well.  And as far as whether I can quantify

1  what percentage come from a certain background, as I had

2  already testified to, there's a derth of quantitative data, so

3  I would not be confident in making any type of likelihood or

4  prediction of what rate or prevalence of victims come from a

5  certain background.  I can say what the trends say.

6  Q.   I understand.  And I guess what I'm getting at here is,

7  let's say you have a pimp who engages in a pimping relationship

8  with a young woman who is from a rougher background.  Again,

9  maybe drug abuse, maybe psych problems, maybe a rough

10 background.  Would you view that disparity, the disparity in

11 power that results from the woman's background, as being itself

12 sex trafficking?

13 A.   Because she comes from a lower socioeconomic background?

14 That, in and of itself, does not equate to trafficking.  Again,

15 it has to involve the force, fraud, coercion, deception,

16 threat, or debt bondage.  I mean, one of those elements need to

17 be there, if she is over the age of 18.  If she is not over the

18 age of 18, consent is not an affirmative defense.

19 Q.   And that's a legal conclusion, correct?

20 A.   That's a conclusion based off of the experience my

21 research shows and experience in reviewing these cases, that

22 consent is not an affirmative defense.  I think it can be a

23 legal conclusion, but it's also a trend that we see in case

24 law.

25 Q.   Okay.  So you've noticed an actual difference between

1    17-year-olds and 18-year-olds clinically that's borne out in

2    published studies?

3    A.    Between 17- and 18-year-olds?

4    Q.    Yes.

5    A.    That difference is evident in how those cases are treated

6    differently in court, but also the simple definition of

7    trafficking under the Trafficking Victims Protection Act.  So

8    as I had previously stated, it's the use of force, fraud,

9    coercion, deception, or threat for the purpose of exploitation,

10   or the exploitation of anyone under the age of 18.  So that

11   last part is where it kind of lends to that determination of

12   whether consent is an affirmative defense or not.

13   Q.    Sure, but those are also just the elements of a 1591

14   charge, right?

15   A.    I mean, you laugh about it, but to really understand how

16   that dynamic plays out in an actual case, it does take, I

17   think, an understanding of what these cases involve, the

18   sociological dynamic between the cases, the misidentification

19   of people who are victims and should be treated as victims,

20   because most people, most jurors, are not going to be aware

21   that a number of states have vacatur statutes to provide

22   post-conviction relief for erroneously criminalized victims.

23   So, you know, it's something that -- it is clear, I agree with

24   you, it's clear in the statute, but in application, there is

25   certainly some gray area as far as what happens.

1   Q.    So, let's say we were in Europe, in England or somewhere

2   where the age of consent is 16 and largely adulthood is keyed

3   to 16 instead of 18.   If I were talking to an English sex

4   trafficking expert, would they be saying the same thing you're

5   saying, but with the age of 16 instead of 18?

6   A.    No, they actually wouldn't, because the Trafficking

7   Victims Protection Act in the United States follows what's in

8   the Palermo Protocol, which is the protocol adopted by the

9   United Nations that follows that same definition that includes

10  anyone under the age of 18 is a victim of trafficking even if

11  the use of force, fraud, coercion, deception or threat is

12  absent.

13  Q.    Okay.   And are you aware of any published studies tending

14  to show that the age of 18 is the magic age in terms of, say,

15  actual psychological ability to consent?

16  A.    I'm not a psychologist, and I don't purport to be.

17  Q.    So no?

18  A.    No.

19  Q.    Okay.   The very next -- so, the end of the sentence that I

20  read to you from the disclosure is, "and the trauma bond that

21  exists between victims and offenders."   You talked a little bit

22  about trauma bonds on direct.   How do you tell if a trauma bond

23  exists, looking at a given case?

24  A.    I have never evaluated a case and stated whether I think a

25  trauma bond exists, I think, actively in a case that I am

1   serving as an expert witness on.  With that being said, I think

2   more of that determination is evident in the dynamics that we

3   see of cases that have already gone through the criminal

4   justice system and whether there appears to have been a trauma

5   bond by the victim returning to the offender, by being

6   recalcitrant to intervention, by not being cooperative with law

7   enforcement, and whether they think or perceive they are in a

8   romantic relationship with their exploiter, with their

9   trafficker.  I think those are some elements.

10      But actively in a case, and by that I mean, in your

11   particular case am I going to say, does a trauma bond exist or

12   not?  No.  But I can opine on whether certain elements are

13   consistent with trauma bonding in other cases and trauma

14   bonding that has been discussed in published peer-reviewed

15   research.

16   Q.   Okay.  So if you are a juror hearing this case, or I guess

17   advising a jury, what factors should they consider in

18   determining whether a woman who didn't run from her pimp did so

19   because it was consensual or did so because she was the subject

20   of a trauma bond?

21   A.   I think that some of the key elements would be the

22   complete -- I guess, first, is she an adult or not?  Two, was

23   there a complete absence of force, fraud, coercion, deception,

24   threat, or debt bondage?  Did she truly have the agency to

25   choose and make this choice, and was she of age to make this

1   choice?  I think those are all elements and dynamics that you

2   would not see in a trauma bonding/sex trafficking type of

3   situation.

4        Conversely, if the victim is saying that she loves her

5   trafficker, but she's giving him all her money, she was

6   deceived into engaging in commercial sex, she was being

7   exploited, I think those are all red flags or indicia of the

8   possibility that she was trauma bonding.  Whether they make

9   that determination or not, I think that that's the purview of

10  the jury.  My role is rather to educate on the extant research,

11  on the data, on the specialized knowledge that I have that

12  allows them the information to make that choice for a

13  particular case.

14  Q.   Okay.  You've mentioned a couple of times now that the

15  absence of violence has to be complete.  In your mind, if a

16  pimping relationship exists for no matter how long a period and

17  there's any violence whatsoever, a slap, for example, that

18  renders the relationship sex trafficking?

19  A.   No.  Again, it's the use of force, fraud, coercion,

20  threat, or deception for the purpose of exploitation.  So if

21  somebody slapped an individual for the purpose of unfairly

22  benefiting from their labor, for exploiting them, that is the

23  dynamic.  So I think that you can't look at either of those

24  aspects in a vacuum, you need to look at the totality of the

25  circumstances for adults.

1    But with juveniles, you can just look at whether somebody

2    is exploiting them.  Even if they're saying they're consenting

3    and there's a complete absence of those other factors, if

4    they're being exploited in the commercial sex industry and

5    they're a minor, that also is an indicia of trafficking.

6    Q.    And so I guess to be clear, and I'm obviously not

7    condoning domestic violence, but you have people who are not

8    good at controlling their -- you know, people in noncommercial

9    sex relationships, just regular domestic relationships, who

10   haven't learned, men and women, who haven't learned how to

11   control their emotions, domestic violence happens sporadically

12   in isolated incidents over the course of many years.  You would

13   separate that type of violence from the type of violence that

14   constitutes sex trafficking; is that correct?

15   A.    Yes.  I mean, again, if there's violence for the purpose

16   of exploitation, that is trafficking.  Or if there's just

17   exploitation of the minor, that is trafficking.  But if it's

18   violence not for the purpose of exploitation, it doesn't fall

19   within my purview as an expert on trafficking.  So it could be

20   domestic violence, or it could be something else; assault.  I

21   don't know.

22   Q.    Okay.  And to clarify one other thing, you've talked about

23   deception.  What does that mean?

24   A.    Oftentimes we see it in terms of false promises.  So

25   deceiving an individual to believe one thing for the purpose of

1   exploitation.  So for example, deceiving them to believe that

2   they're a significant other, or that they are the only one, or

3   that we're only going to do this for a year, or we're going to

4   start a business, or if you do this, you know, a contingency, I

5   will do something else for you, I will help meet your

6   aspirations of becoming a model.  It could be a number of

7   things.  So we see deception, or basically a false promise

8   manifest in a number of different ways in human trafficking

9   dynamics.

10  Q.    So the victim is obviously aware that they're doing

11  commercial sex work, but they're doing it for a purpose, an

12  indirect purpose, that the defendant has no intention of

13  following through on?

14  A.    Again, it depends on the type of trafficking.  So for

15  trafficking within the commercial sex industry, it could be

16  deception to say, you know, we're only going to do this for a

17  year, or we're going to split the money 50/50, but I'm going to

18  keep your half of it, so I'm going to keep 100% of it, and I'm

19  going to hold it for you like a purse and you'll get it at a

20  later date.

21       Or we've seen it happen in other forms of commercial sex.

22  For example, in the case of U.S. v. Maksimenko, we saw girls

23  coming in and thinking that they were going to be working at a

24  restaurant and found themselves working at a strip club, giving

25  their money from the strip club to their trafficker.

1       So it really depends on the trafficking situation.  It

2  depends on what the void is for the victim, what the trafficker

3  is able to promise, and really what would be the most

4  successful or easiest way to get that person into an

5  exploitable position.

6  Q.   Okay.  I guess I'm a little confused, because -- and

7  again, I'm not condoning this behavior, but if a man were to

8  make promises to a woman about, whatever, marriage, the

9  seriousness of their relationship, even more, I guess, tangible

10 things in order to obtain consensual sex from a woman, most

11 people would not view that in and of itself as rape, but your

12 position is that because it's commercial sex, I guess something

13 changes and that type of deception can be sex trafficking?

14 A.   No, sir.  My position is that if somebody is deceived and

15 given a false promise for the purpose of exploitation.  So for

16 the purpose of unfairly or unjustly benefiting from their labor

17 or work, that is what's tantamount to trafficking that we've

18 seen.  So if somebody is making the false promise to marry them

19 in exchange for sex, it would have to be commercialized sex.

20 It would have to be unfairly benefiting from their labor in

21 order to reach the benchmark of trafficking.

22 Q.   Okay.  Do these have -- you say to reach the benchmark of

23 trafficking.  Does that mean anything other than your view of

24 what satisfies the elements of 1591?

25 A.   Can you repeat that question in a different way?

1    Q.   You've referred to, well, if X is met, if deception

2    exists, if there is force for the purpose of promoting

3    commercial sex, then it, again to quote what you just said,

4    meets the benchmark of sex trafficking.  Does that benchmark of

5    sex trafficking have any type of scientific, empirical,

6    clinical, sociological significance, or are you just

7    interpreting 18 U.S.C. 1591?

8    A.   No, it's definitely not just my interpretation of the law

9    in this matter, and perhaps I should have been a little bit

10   more careful in choosing my words.  I think it maybe rises to

11   the red flags of trafficking.  And this is essentially a

12   determination of whether it's consistent with my research, my

13   experience, my education, my review of case law.  So whether

14   something rises to the level of that is consistent with all of

15   those other things that I've done to really make me an expert

16   within the field.  So it isn't simply just a determination of

17   whether it meets the law in that regard.

18   Q.   Okay.  So what is it?  When you say, you know, meets the

19   benchmark of sex trafficking, that corresponds to, okay, we've

20   observed that things that "meet the benchmark of sex

21   trafficking" are correlated with worse clinical outcomes for

22   the victims?  I mean, something like that?  I guess, what

23   scientifically are you tying it to?

24   A.   I would tie it scientifically to whether it is consistent

25   with qualitative research in the field, review of case law, and

1  my experience in working on human trafficking cases.  So

2  whether it rises to the level where I say it is consistent or

3  inconsistent with those elements, which is research, which is

4  qualitative research.

5  Q.   Okay, but elements of what you've observed as a pattern of

6  things that happen in the real world, right?  What's the

7  significance?  I mean, you can observe plenty of human

8  institutions and say, okay, this looks like an institution that

9  I've seen before, but that doesn't establish that the

10 institution is harmful.  When you say that X, Y or Z meets the

11 benchmark for sex trafficking, okay, why was the benchmark set

12 at where you're setting it?

13 A.   Again, it was probably a poor choice of words using the

14 term benchmark.  But whether a case is consistent with my

15 research and experience, or whether elements of a case are

16 consistent with my research, experience, and the work that I've

17 done, I think it does lend to an opinion of whether essentially

18 it's consistent with trafficking or not.

19     If you were to tell me and give me a hypothetical saying,

20 Dr. Kim, can you opine on whether a case of a married couple,

21 or I guess an engaged couple that says he was going to marry

22 her if he had sex with her, and then he didn't marry her, is

23 that consistent with trafficking, the answer would be, no.  And

24 the reason why I'm able to make that opinion is because I have

25 not seen that in case law, I have not seen that with

1    consistency in my interviews with convicted traffickers, in my

2    interviews with victims of sex trafficking, and my interviews

3    with consenting sex workers.  I just haven't seen that also in

4    published research from my colleagues.  I haven't seen it

5    discussed in the number of conferences that I've participated

6    in.

7         Again, I tend to be a verbose person, so excuse my misuse

8    of the word benchmark, but I think it's more just looking at

9    consistency between the elements of one case to my background,

10   my research, my expertise.

11   Q.   Okay.  So you actually named a couple of things that are

12   what I guess I'm looking for, which is, you said that it's

13   consistent with what you've seen in the case law, you said it's

14   consistent with your interviews of convicted sex traffickers,

15   you said that it's consistent with what you've seen from

16   victims of sex trafficking.  And I'm assuming you're applying

17   the label of victim based on judicial applications of that

18   label, correct?

19   A.   Yes.

20   Q.   Okay.  So I guess, doesn't that -- those things are all

21   just gloss on 18 U.S.C. 1591.

22   A.   In your opinion or mine?

23   Q.   What the case law says, what people get convicted of, you

24   know, who the Government brands as being a victim of a 1591 sex

25   trafficking case.  That suggests that you're just applying, in

1    one way or the other, 1591.

2    A.    I don't think that's just suggestive of that, but I'm not

3    sure what your question is.

4    Q.    Okay.  I guess if you have an answer, why isn't it?

5    A.    Why my application of my expertise on whether something is

6    consistent with trafficking is -- what's your question again?

7    Q.    So again, you mentioned the case law in terms of what you

8    consider to be sex trafficking, what merits the conclusion.  I

9    think you've mentioned before that you recognize that you used

10   the terminology that aligns with the elements of 1591.  You've

11   talked about what you've seen in the case law.  You've talked

12   about what you've seen from folks convicted of sex trafficking,

13   where the conclusion is that if they've been convicted, they

14   are a sex trafficker, they meet your benchmark.  And then the

15   only other thing you gave was the research of others in your

16   field, which I have no doubt that what you're doing is

17   comparable to what other people in your field are doing.  I'm

18   just questioning whether the whole field is largely applying

19   1591.

20   A.    In my opinion, no.  I think we're applying our research

21   and experience.  Perhaps I should qualify your application and

22   understanding of what a review of case law is probably from the

23   lens of an attorney.  The way that I review it is through the

24   lens of a researcher.  So I'm not reviewing it for case law in

25   a way that an attorney would use it in a court of law.  I've

1  done systematic content analysis of these cases to look for

2  themes, to draw qualitative conclusions on what do you see

3  across cases, what are some dynamics that you don't see across

4  cases.

5      So in my experience, in my understanding, it's not a

6  simple matter of applying the law or applying our understanding

7  or interpretation of the law, but it's rather our expertise in

8  research, and I think that in cases, Daubert cases of other

9  experts, for example, Florence Burke, they've drawn similar

10 conclusions on the admissibility of this assessment, of this

11 research in human trafficking cases.

12 Q.   Sure.  I'll try and move on here, but I guess -- you used

13 the term what you've seen across various cases.  If I were

14 someone who had what I would argue as a political view that

15 marriage, the standard marriage, is an oppressive institution

16 and I were to go and study the relationships between men and

17 women, and men and men, and women and women who are married,

18 and then were to go out and point to real world situations that

19 match my observations, none of that establishes that marriage

20 is bad or is an inherently oppressive institution.  So I guess

21 the benchmark that you're applying, when you say, "it matches

22 what I've seen across cases," what says those cases are bad?

23 What says those cases --

24      MS. SIMMS:  Your Honor, I'm going to object.  I just

25 feel like this is getting into some argument that's not really

1   appropriate for examining the witness.  I mean, he can argue

2   some of this stuff to the Court.

3          THE COURT:  Well, I'll let -- I like Mr. Harrison's

4   idea that we're going to move on, so I'll let the witness

5   answer this question and then let's move on.

6          So I'll overrule the objection.  The witness can

7   answer the question, if she understands it, and then let's move

8   on.

9   A.   Yes, sir.  My understanding of what you just described is

10  somebody who has a priori opinion about an institution and then

11  goes out and uses anecdotes to confirm or support that priori

12  opinion.  That is not what a researcher does.  That's not what

13  you're trained and go through many years of schooling to become

14  a Ph.D., it's not what it entails, and it's certainly not what

15  I've done in my research.  And it's certainly not what my

16  colleagues have done.  It would preclude us from getting

17  published in peer-reviewed journal articles where our peers

18  have essentially said that we meet the rigor of research in

19  conducting our interviews and that our results are essentially

20  without bias to the extent that they've been evaluated by other

21  experts within the field.

22      So I don't agree with your assessment of what I've done,

23  or what my colleagues have done, or what rises to the level of

24  our expertise.

25

1  BY MR. HARRISON:

2  Q.    Okay.  So Doctor, I'm going to shift gears here.  You

3  wrote a -- I'm going to read you the title, and I can give you

4  additional information if you need it, but it's titled,

5  Projected Heroes and Self-Perceived Manipulators: Understanding

6  the Duplicitous Identities of Human Traffickers.  Do you recall

7  writing that?

8  A.    Yes.

9  Q.    Okay.  I'm just going to read a line from the abstract.

10  You said:  "Sex traffickers exercise their coercive power

11  predominately through the use of deception and fraud,

12  projecting themselves as 'honest heroes' and 'lovers' of their

13  victims.  Rather than using force to perpetually repress

14  victims, sex traffickers more frequently gain compliance by

15  building a trauma bond with their victims."  Does that sound

16  consistent with your views?

17  A.    Yes.

18  Q.    And I think you used the additional, on direct, you used

19  the additional example of sometimes you'll see the exploitation

20  or the perversion of a mentor/mentee relationship as another

21  thing you've seen.  Is that correct?

22  A.    I've seen that between traffickers, where one trafficker

23  is the mentor and the other trafficker is the mentee.

24  Q.    Okay.  But the types of relationships that create these

25  trauma bonds, is it true that they tend to be close and/or

1   long-term relationships?

2   A.   Can you repeat that question?

3   Q.   I guess, do these tend to be intimate relationships that

4   create trauma bonds?

5   A.   Intimate as far as emotionally intimate?  Physically

6   intimate?

7   Q.   So, a bank robbery, where someone goes in and robs a bank

8   and leaves five minutes later, you would agree is not likely to

9   create a trauma bond with the teller?

10  A.   I'm not an expert on bank robberies.

11  Q.   But --

12  A.   I wouldn't be able to opine.  I mean, I have not reviewed

13  that research, so I have no idea.

14  Q.   Can trauma bonds be formed after a brief meeting?

15  A.   In my research and in my review, my qualitative analysis

16  of extant case law, no, it's not a brief meeting.  It doesn't

17  involve a short encounter.  And by short encounter, I mean like

18  one day or one conversation.

19  Q.   Okay.  And by long-term, I didn't necessarily means years,

20  but I guess I meant is a hallmark of the type of relationship

21  that creates a trauma bond a somewhat continuous relationship?

22  A.   I think it can be.  I've interviewed survivors that say it

23  took five days.  I've seen cases where it took multiple months,

24  if not a year.  So I think it really depends on the trafficker,

25  how skilled they are, it depends on the susceptibility of the

1  victim and what's going on in their relationship.  So I think

2  it really depends on the dynamic of the victimization and the

3  victimizer.

4  Q.  Okay.

5  A.  But as far as like, say, how common it is, again, that

6  would take quantitative data collection to tell you, you know,

7  30% or 40% or 50%, and I'm not going to opine on that because

8  that data are not reliable.

9  Q.  Sure.  And I'm less interested in the length of time it

10  takes to form these bonds and I guess more, have you observed

11  cases where a trauma bond is formed with someone that you see

12  once a week for an hour?

13  A.  I think that's a very specific hypothetical where I don't

14  recall somebody who developed a trauma bond who saw their

15  trafficker once a week for an hour, specifically.

16  Q.  Okay.

17  A.  I'm just trying to be as direct --

18  Q.  No, I understand.  I guess I was asking for things of the

19  general type.  Would a sporadic relationship that's not a

20  day-to-day relationship and has never been a day-to-day

21  relationship in your experience be likely to produce trauma

22  bonding?

23  A.  Again, when you're using the term likely, that lends me to

24  a regression model where I can actually predict the likelihood,

25  which I cannot do.

1          A sporadic relationship where the trauma bonding or the

2    trafficking did not involve day-to-day, or daily contact, it

3    does exist and it has happened, the probability of which, or

4    the odds of which I'm not going to opine upon because there

5    isn't enough quantitative research for me to suggest the

6    likelihood of that happening.  But has it happened?  Yes.

7    Q.   Okay.  Now to clarify, I guess, as I ask these questions,

8    obviously anything I ask that you have quantitative data for, I

9    would want to know about it, but I'm also asking for -- you

10   know, you've made these qualitative assessments based on your

11   review of the cases, the review of the case law, etc., and so

12   I'm asking, you can tell the difference, even if you can't put

13   a precise figure on something, you can tell the difference

14   between a situation of, I've never seen that, or, that seems

15   exceptionally unlikely and inconsistent with my experience,

16   and, no, that happens all the time, right?

17   A.   Sure.  I mean, I can certainly say whether it's possible

18   or whether it's more likely than not based off of my research,

19   yes.

20   Q.   Okay.  I'm not trying to be difficult, but it seems like a

21   fairly straight-forward question, that a more intimate

22   relationship is more likely to create a trauma bonding

23   relationship than a more remote one where the two individuals

24   don't see each other very often.  Is that correct?

25   A.   The way that I perceive intimacy, and basically, it's an

1   understanding of both physical and emotional intimacy, it can

2   happen either way.  But more often than not, does it involve

3   more regular contact, which doesn't need to be daily?  Then,

4   yes, I would say it involves more regular contact.  But that

5   contact can be over the phone, it can be through text message.

6   It doesn't need to be physical presence.

7   Q.   Okay.

8   A.   And I'm not trying to be difficult, either.

9   Q.   No, I understand.  Have you observed cases where trauma

10  bonding exists and there's never been a sexual relationship?

11  A.   Yes.

12  Q.   Okay.  What made you conclude that a trauma bond existed

13  in that or those circumstances?

14        MS. SIMMS:  I'm sorry; I just want some clarification

15  on the question.  Is Mr. Harrison asking, there's never been a

16  sexual relationship between the person who has the trauma bond

17  and the -- I guess I'm confused as to what does he mean.

18        MR. HARRISON:  Okay.  I think Dr. Kim understood.

19  BY MR. HARRISON:

20  Q.   But, can a trauma bond be formed between a victim and a

21  pimp where the victim and the pimp do not, themselves, have

22  sexual contact with each other?

23  A.   Yes.

24  Q.   Okay.  In those situations, what is it that leads you to

25  conclude that trauma bonding was present?

1   A.   Essentially, again, it's the dynamic between the

2   trafficker and the victim in those cases.  So I think it's very

3   rare in the cases that I've seen, but it would involve more of

4   a trauma bond that's associated with a different type of

5   emotional intimacy.  So for example, somebody acting the part

6   of a father or role model as opposed to an intimate partner.

7   Sometimes it could be also trauma through physical force and

8   abuse and a linking in that regard.

9        Where I would say that there's consistency between that

10  case and other cases involving trauma bonding is, again, when

11  the victim is being exploited, who is recalcitrant to

12  intervention, who is engaging, even post-rescue, engaging in

13  sexually dysfunctional relationships, who is still contacting

14  their victimizer, who is still seeing the victimizer in a

15  positive light.  These are all consistent with trauma bonding.

16  Q.   Now, I believe you mentioned on direct that it can be

17  harder for a pimp or a sex trafficker to maintain a gorilla

18  relationship than a Romeo relationship.  Is that a fair

19  paraphrase of what you said?

20  A.   Yes.

21  Q.   Is that because regular violence makes the victim less apt

22  to be trauma bonded and more apt to run or report themselves to

23  the police, or use any means to break off the relationship?

24  A.   Yes.  Essentially, somebody who is being regularly

25  physically abused is, in my experience, in my research and

1  review of case law, those pimping/sex trafficking dynamics tend

2  to be shorter lived because there's a greater push to run away,

3  as opposed to something that is a cyclical type of abuse, where

4  they're being physically abused, but then treated very well.

5  That draws the trauma bond with greater strength.

6  Q.   Gotcha.  Have you had any experience -- we've kind of

7  focused not necessarily on the one-on-one, but a single pimp

8  with one victim or perhaps in the presence of other victims.

9  But have you had experience with, like, a true sex trafficking

10  conspiracy where there are maybe distinct and specialized

11  roles?

12  A.   Can you clarify distinct and specialized roles?  Of

13  various traffickers, or between the traffickers and their

14  victims?

15  Q.   I guess of the various -- you know, Bob's our IT guy, he

16  puts up the Backpage ads.  Jim procures the drugs to keep the

17  girls drugged up.  Jack is the enforcer.  Have you had

18  experience either directly or on review of the case law with --

19  A.   Yes.

20  Q.   Okay.  In that type of a relationship, where are trauma

21  bonds typically seen?  Between the victim and who in the

22  organization?

23  A.   I would say the trauma bond is typically strongest between

24  the trafficker and what is colloquially referred to as the

25  bottom.  That can be the girl who's been trafficked the

1  longest, or has gained the most trust of the trafficker.  So

2  the bottom, it can happen in different ways, but the trafficker

3  refers to the bottom as typically the female that has gained

4  the most trust within the organization and typically does do

5  more of the assigned tasks or more of the tasks that are of

6  high risk or high visibility.

7  Q.   Okay.  And when you say the trafficker in that model you

8  just laid out, you mean the person who most resembles the pimp,

9  the person who sends the women out on a daily basis, who maybe

10 collects the money from the johns or from the women after they

11 get it from the johns, who has direct contact with the women?

12 Is that typically the person you had in mind as the "sex

13 trafficker"?

14 A.   When I use the word trafficker, I mean the trafficker, the

15 person who is engaging in sex trafficking, who is the one who

16 is exploiting other individuals through force, fraud, coercion,

17 deception, or exploiting minors.

18      Typically the bottom, although she might engage in some of

19 the tasks associated with the trafficking conspiracy, typically

20 she or he, whoever the bottom may be, is not the one unfairly

21 benefiting from labor.  They're not the one that's sex

22 trafficking, and that's why I don't refer to him or her as the

23 trafficker.

24      Now, are these people sometimes convicted of trafficking

25 related charges?  Absolutely.  And I can give you a few

1   examples.  But do they typically get much lower, if not

2   suspended sentences?  Yes.  Because their view in the

3   participation is as a victim, sometimes as an uncooperative

4   victim, but as somebody who did have a hand in the trafficking

5   of third-parties.

6   Q.   And you're talking about, with the bottom, I assume that

7   you're incorporating some of the things you mentioned about

8   women who will engage in recruitment of new prostitutes and

9   will engage in conduct like that; is that correct?

10  A.   Yes, a bottom can have a hand in the recruitment of new

11  sex workers or victims of trafficking, absolutely.

12  Q.   Okay.  And you don't consider the -- and again, I'm trying

13  to summarize what you just said.  You don't believe that the

14  bottom has anywhere near the degree of culpability that a true

15  sex trafficker has; is that correct?

16  A.   That's not just, you know, my opinion, it's also what has

17  manifested in actual cases.  So for example, the case of

18  California -- or In Re: James Joseph.  The bottom was Avisa

19  Lavassani, who was his wife.  She got a fully suspended

20  sentence, he got life in prison.  So it's not just culpability

21  and responsibility, from my opinion, but it's also what plays

22  out and manifests in case law.

23      There's also, you know, discussions of the erroneous

24  criminalization that happens of the bottom because of her

25  involvement, and that's why a lot of these cases can sometimes

1   result in expungements through vacatur statutes, because

2   victims who are criminalized for something associated with

3   their victimization are viewed, you know, under the law as less

4   culpable.

5   Q.   Okay.  I guess is a key part of what makes the bottoms

6   you're referring to less culpable the fact that they aren't

7   gaining the type of benefit, they aren't exploiting the labor

8   of prostitutes in the way that the sex traffickers are?

9   A.   Yes.

10  Q.   So, I guess, have you observed a sex trafficking

11  relationship where they equitably divided the proceeds of the

12  commercial sex activity?

13  A.   I mean, traffickers typically will often -- or not

14  typically.  They often, though, offer a choice.  So a choice to

15  survivors, or a choice to victims by saying, you can be all in

16  by giving me all your money, or we can go 50/50 and you're

17  taking care of your own bills.  But you can have

18  pimping/pandering relationships where, again, it's consenting

19  and it's adults where they're saying, I'll take 15% to give you

20  clientele or to provide you with security, and there is no

21  force, fraud, coercion, deception, and really there's no

22  exploitation because there's a full understanding of what the

23  dynamic is.

24  Q.   Would you say that in the majority -- and feel free to

25  characterize it how you want -- in half, the majority, the vast

majority of sex trafficking relationships you've seen, that an

unfair economic exploitation is a hallmark of the relationship

or is associated with the relationship?

A.   Can you qualify what you mean by unfair?  So, like, give

me a percentage.  What do you consider unfair?  I think for me

what I consider unfair is anything that is not what a woman

with agency who's an adult knowingly consented to.  So I can

agree to an 85/15 split in your favor, and that could be fair

based off of we both know that we're both adults, we both

knowingly consent to it, and someone else can view it as

unfair.  I think it's more kind of the knowledge, the

awareness, the consent, and the complete absence of any

deception in that arrangement.

Q.   Do you have any experience with sex traffickers who did

not realize any financial gain from the sex trafficking

relationship?

A.   Did not -- any sex traffickers who did not get any

financial gain from the sex trafficking relationship?

Q.   Yes.  Have you ever seen that?

A.   No.  Not personally, no.

Q.   Okay.  So then would it be fair to say that a hallmark of

sex trafficking is that it's a profit driven, at least in part,

crime on the part of the sex trafficker?

      MS. SIMMS:  Judge, I'm just going to object.  I think

we're getting farther away from the Daubert considerations as

1   in like -- I mean, clearly Mr. Harrison thinks she's qualified

2   to give these opinions, because he keeps asking her opinion.

3   And I think it's pretty clear that this is substance that will

4   educate the jury, so I don't know that these questions are at

5   the heart of what we're here to do today.

6          THE COURT:  What's your response, Mr. Harrison?

7          MR. HARRISON:  If I could have this question -- if I

8   could have one more question on this vein to ask about

9   Mr. Woods' alleged role and her experience with the roles of

10  Mr. Woods' type, I can probably move on.

11         THE COURT:  Let's try to move on.  I mean, it seems

12  like you're going all over the place with this.  Again, I'm

13  allowing counsel wide latitude here, but I'm not really seeing

14  the focus of that last question.  So let's try to move it on

15  and stay on task.

16  BY MR. HARRISON:

17  Q.   Dr. Kim, do you have any experience with "enforcers" in a

18  sex trafficking organization?

19  A.   Yes.

20  Q.   First of all, what does that mean, and what is your

21  experience?

22  A.   An enforcer, based off of my experience and what I've seen

23  in the qualitative research that I've conducted, as well as the

24  case law that I've reviewed, is somebody who is either

25  assisting in gaining compliance of the victims themselves

1   and/or protecting the well-being of a victim during a

2   commercial sex exchange.  So for example, commercial sex

3   consumers can sometimes attempt to rape or not pay their

4   provider, in which case an enforcer or somebody who is the

5   muscle of the organization would gain compliance or really

6   protect the victim from an additional victimization by a

7   commercial sex consumer.

8   Q.   Okay.  Do you commonly see trauma bonds between women and

9   enforcers in organizations?

10  A.   It's possible, and I have seen it, but I don't see it in

11  the majority of cases.  But again, trauma bonding can be fluid,

12  so it can be between different individuals within an

13  organization, because victims are often passed hand-in-hand to

14  other co-conspirators.

15  Q.   Does the presence of trauma bonding in your mind always

16  indicate force, or I guess more broadly, sex trafficking, or is

17  it something that can explain why a victim of sex trafficking

18  behaved in a way that is maybe not in their best interests or

19  would seem hard to understand to a jury?

20  A.   Can you ask that question in another way?  I didn't really

21  understand it.

22  Q.   Is it necessarily the case that in 100% of situations

23  where you believe trauma bonding is present that sex

24  trafficking is also present?

25  A.   Again, I don't want to speak in percentages, because there

1   isn't quantitative data to support those assertions or

2   opinions, but if you're asking, do 100% of sex trafficking

3   cases involve trauma bonding, the answer is no.

4   Q.   Okay.  I was actually asking it the opposite way.  Is

5   trauma bonding -- and I know it's not a diagnosis, but I'm

6   using that term colloquially -- is that a diagnosis that you'd

7   apply once you've decided that something is sex trafficking?

8   A.   I have not studied the application of trauma bonding to

9   other phenomenon, such as domestic violence or other things, so

10  I would not be able to opine on that.

11  Q.   Okay.  Have you done any particular research into

12  cross-racial trauma bonding?

13  A.   No.  Not specifically, no.

14  Q.   So you don't have any general thoughts of whether it's

15  more or less likely to occur between individuals of different

16  races?

17  A.   No.

18  Q.   Okay.  Could you tell me, in general, what are some of the

19  foundational publications in your field that you consider to be

20  reliable?

21  A.   Within the field of criminology, or human trafficking

22  specifically?

23  Q.   I would say human trafficking specifically.

24  A.   I mean, you have the Journal of Human Trafficking.  You

25  have any, really, criminological journals, so the Journal of

1   Trends in Organized Crime.  You have Social Inclusion, places

2   where I've published.  You have quantitative methodology

3   journals, I think the Journal of Quantitative Criminology.  But

4   again, there aren't any, to my knowledge, any studies published

5   in those, in the quantitative journals, because of the derth of

6   quantitative data on that.

7        But I think there are a number of top ranking journals

8   that feature articles on trafficking, so I don't necessarily

9   think I would really rely upon one journal over another as

10  being the authority, but rather specific researchers that have

11  published with consistency on this topic.  So along with

12  myself, you have Joan Reid, who is out of Florida.  You have

13  Amy Farrell, who I think, last I heard, was at Northeastern.

14  You have Louise Shelley, who is at George Mason.  So you do

15  have some well published authors that focus on

16  trafficking-related issues sort of regardless of where they're

17  publishing.

18  Q.    Okay.  Nothing you'd immediately identify as like a bible

19  of the field, a treatise, anything like that?

20  A.    No.  Not on human trafficking, no.

21  Q.    Okay.  Have you ever testified that a person has not, or

22  was not trauma bonded to a putative sex trafficker?

23  A.    So you're saying in the cases where I have been retained

24  by the prosecution, whether trauma bonding did not exist in

25  those instances?

1   Q.   A case where you've been retained by anyone and said that

2   you thought that it was likely or probable that no trauma

3   bonding existed.

4   A.   Well, in some of the cases, I don't really focus on trauma

5   bonding.  So for example, I believe I had a defense case in Los

6   Angeles where it was a survivor of sex trafficking who was

7   engaging in survival sex.  I don't believe trauma bonding was

8   even discussed in that case.  In the most recent case that I

9   testified for the defense for, federal public defender, in

10  Harrisburg, Pennsylvania, if trauma bonding was discussed, I

11  did not opine on whether the victim in the case was trauma

12  bonded to her offender, but rather the consistency between her

13  role as a victim of trafficking as opposed to a trafficker.

14       So I think it's a little bit difficult to answer your

15  question, because when I'm on the stand in front of the Court,

16  I don't opine whether that case involved trauma bonding or not.

17  Essentially, sometimes I go in without knowing the specifics of

18  the case, but really just opining and testifying what trauma

19  bonding is, how we see it in extant cases in my research, and

20  then it's really the prosecutor's job to make the argument of

21  whether it existed in that particular case, and that decision

22  is ultimately up to the jury.  I'm simply giving my expert

23  knowledge to empower the jury with the information they need to

24  make that determination.

25  Q.   Okay.  And as you've used the terms, is there a difference

1  between force and coercion, or are those synonyms?

2  A.   Force and coercion are certainly not synonyms.  I think

3  coercion is sort of -- it's more along the lines of using

4  threats and using maybe other elements to gain compliance.  I

5  mean, it can involve threat of force, but it can involve other

6  threats or other coercive elements, like coercion through

7  romantic relationships.  Coercion, like if you loved me, you

8  would really do this, versus physical force.  When I'm talking

9  about force, I'm talking about physical violence or actual

10  physical engagements between the trafficker and the victim that

11  are more violent.

12  Q.   Okay.  You've described part of your definition of

13  coercion as encompassing, I think, encompassing deception.

14  A.   I guess coercion and deception, I think that there is

15  certainly some overlap, but it can also involve, like, I guess

16  the threat of violence more so.  So like a threat or, of

17  course, a belief.  I use the terms really hand-in-hand, a lot

18  of times, coercion and deception.

19          MR. HARRISON:  Okay.  No further questions.  Thank

20  you.

21          THE COURT:  I've got just a couple of questions.

22          In terms of the areas that you are identified as

23  rendering expert opinion testimony on, and we've already talked

24  about trauma bonds, but one of the other areas that was

25  identified that you would be testifying on is the factors that

1 influence if and when a victim chooses to disclose the abuse.

2 Can you kind of elaborate on that?

3         THE WITNESS:  Yes, Your Honor.  So, I think that that

4 really falls under the umbrella of trauma bonding, and

5 essentially most -- I think the average person, the average

6 juror, is going to believe, or may believe that a victim of

7 trafficking is likely to disclose their abuse to authorities,

8 to a person that they have a close relationship with, but the

9 reality is because of the trauma bonding, because of the nature

10 of the crime, because of the coercion, deception, recruitment

11 and control methods, it is actually quite unlikely for a victim

12 to self-identify and disclose that abuse.  So I think that that

13 is probably what speaks to that area of expertise that I would

14 say falls under the umbrella of trauma bonding, but also the

15 recruitment and control methods used by traffickers typically.

16         THE COURT:  And then, again, we covered this, but one

17 of the other areas that I'd like you to focus on -- this was

18 something that was identified in the pleadings regarding your

19 proposed testimony, the clear distinction between consenting

20 sex workers and sex trafficked victims.

21         THE WITNESS:  Yes, Your Honor.  I'm glad you brought

22 that up.  So a lot of -- it is difficult to discern the

23 difference between the two, not just by the average person, but

24 also by law enforcement and others, because there is a lot of

25 overlap, there is misidentification, there is this idea that a

1    victim of trafficking would not behave as a consenting sex

2    worker.  But oftentimes they do.  They walk alongside

3    consenting sex workers on the track, and they oftentimes

4    interact with each other.

5            The distinction between the two is a consenting sex

6    worker is, one, an adult, somebody over the age of 18, but that

7    is knowingly consenting to engage in the commercial sex

8    industry and is really not being exploited through the use of

9    force, fraud, coercion, deception or threat.  An example that I

10   give when I'm teaching about this is a woman named Norma Jean

11   Almodovar.  She wrote a book called From Cop to Call Girl.

12   This woman was literally a Los Angeles police officer and

13   became a sex worker.  She's an example of a consenting

14   prostitute, or a consenting sex worker.  She is somebody who is

15   an example of an individual who was not, and is not a victim of

16   trafficking.

17           So the distinction between a consenting sex worker

18   and a victim of trafficking is very important, and it's

19   something that I certainly have, based off of my qualitative

20   interviews and my research within the field, have the expertise

21   needed to opine upon this.

22           THE COURT:  You see sometimes in the news, and I'm

23   not sure whether I'm using the right terminology, but you see

24   like these high-end prostitution rings where very wealthy

25   people are procuring services.  Are those type of -- I mean, I

1  suppose trafficking could occur in those type of situations,

2  but am I correct in assuming that since there's a lot of money

3  involved, and actually the prostitute is receiving a lot of

4  compensation, it's less likely human trafficking?

5          THE WITNESS:  I think that's an excellent question,

6  Your Honor, and that's one of the reasons why I serve as an

7  expert witness, because that's a little bit of a misnomer or a

8  misidentification to think that because there's so much money

9  involved that it would not involve sex trafficking.  It would

10  likely involve a different type of trafficker and a different

11  type of victim, but it can happen in any field.  And I can't

12  really say whether it's more likely than not, but the example

13  of the case that I gave earlier, the In Re: James Joseph, where

14  I testified as an expert witness for the prosecution, it

15  involved multi-million dollar individuals who were the

16  consumers who were flying these girls out of the country, and

17  he was sentenced to life in prison without the possibility of

18  parole.  That's an example of a case where it was trafficking.

19  But there was a lot of money involved, and you would not think

20  ostensibly from the outside looking in that it would be

21  catering to these higher risk clientele.  Same thing as you've

22  seen in the media about the Epstein case.

23          So to tell you -- I can't opine what percentage of

24  these, you know, high-priced call girls, what percentage of

25  them are trafficked or not, but I think it's rather we're

1  looking at whether they're independent, whether they're being

2  coerced, and it really takes a trauma informed interview to

3  determine.  But the example I gave of Norma Jean Almodovar, the

4  call girl, there's examples like that across the country.

5  There's journalists that subsidize their journalism income by

6  working as a sex worker.  It does happen.  So consenting is

7  something that exists, and it's just imperative for your

8  courtroom and for the jury to be able to understand the

9  dynamics and the distinction between the two.

10         THE COURT:  So the money -- for example, let's say

11  there's a lot of money involved.  The money can be used as a

12  coercive means?

13         THE WITNESS:  It absolutely can be, but typically in

14  the cases that I've seen, it is not the only one.  It is not

15  the only coercive means.

16         And when it is more money-oriented, I see that a lot

17  more with international cases, with really, really impoverished

18  women or children being taken out of the country, or sometimes

19  sold by their parents to go work.  And sometimes even legal

20  brothels, like the FKK clubs in Germany or some of the legal

21  brothels, these victims of trafficking are working there.

22         THE COURT:  Okay.  Is there redirect?

23         MS. SIMMS:  There is.  I'm going to try to keep it

24  short.  I just want to clarify -- I didn't realize I needed to

25  ask this question until Dr. Mehlman reminded me.

1          REDIRECT EXAMINATION

2    BY MS. SIMMS:

3    Q.   Dr. Mehlman, you testified that sometimes the things that

4    you know about the criminal cases that you're retained in are

5    different from the things that you know about the civil cases.

6    Is that correct?

7    A.   I think that a lot of the research and experience feed

8    into both, but for the civil cases I work in, I think an

9    additional specialized knowledge is needed and I talk about

10   other aspects.  For example, third-party involvement in the

11   human trafficking enterprises and whether they're unwitting

12   targets by these sex traffickers.

13   Q.   So let me ask you, if you're retained in a civil case, you

14   stated earlier that you do familiarize yourself intimately with

15   the facts of that civil case; is that correct?

16   A.   Yes, I do.

17   Q.   Okay.  I just want to make sure, because if it comes up

18   later, I don't want to step in anything.  Have you been

19   retained in a case -- oh, my gosh.  I can't remember what it's

20   captioned, but it's a case out of New Mexico where basically

21   some family members of a victim in this case have sued a hotel

22   and its parent company.  I can't find the -- are you aware of

23   what I'm talking about?

24   A.   Yes, I am aware of what you're talking about.  I have not

25   been officially retained in that case.  However, I am retained

1  by -- I am retained in other cases involving that same

2  parent -- or one of those same companies, one of those same

3  businesses, and there's a possibility I will be officially

4  retained in that case.

5  Q.   Okay.  So the case where family members of a victim in

6  this case are suing a hotel and their, like, parent

7  corporation, have you received any discovery to go through for

8  that civil case?

9  A.   No.

10  Q.   Okay.

11  A.   Well, with that being said, not to my knowledge, and I

12  have not reviewed any discovery.  So if there is something

13  uploaded on a database that I have access to, I have not yet

14  gone through that yet, and to my understanding in my

15  conversation with my client, I have not been formally retained

16  on that case.  So I don't think I would have any of that

17  information anyway.

18  Q.   Okay.  So I just wanted to clarify that you don't know the

19  facts of this case, you're being called simply as an educator

20  of the jury on the themes and concepts of the sex trafficking

21  industry?

22  A.   Yes, that is correct.

23       MS. SIMMS:  Okay.  That's all I had, Judge.

24       THE COURT:  Anything else for this witness?

25       MS. SIMMS:  No, Your Honor.

1          MR. HARRISON:  No, Your Honor.

2          THE COURT:  All right.  May Dr. Mehlman-Orozco be

3   excused?

4          MS. SIMMS:  She may.

5          THE COURT:  Well, did you want her to listen in on

6   the other testimony?

7          MS. SIMMS:  I don't object to that.  I think it's up

8   to her.  I know we've kept her, and I don't know if the time

9   change is an issue.  So it would be up to her if she would want

10  to stick around.

11          THE COURT:  I'll leave that up to you,

12  Dr. Mehlman-Orozco.

13          THE WITNESS:  Okay.  I might go off video, but I

14  might listen in, if that's okay.

15          THE COURT:  All right.  What's counsel's preference?

16  It's noontime.  Do you want to break for lunch and come back

17  and take the other witness?

18          MS. SIMMS:  Can I check with the other witness as to

19  what his schedule is?  Because I'll defer to the Court on that,

20  unless Mr. Langer is not available this afternoon.

21          THE COURT:  Mr. Langer, can you hear us?  He's on

22  mute.

23          THE WITNESS:  Yes, I can hear you, Your Honor.

24          THE COURT:  I'm sorry?

25          THE WITNESS:  Yes, sir, we can break for lunch and I

1  can be available after lunch whenever you say.

2          THE COURT:  If we take a one-hour break and then come

3  back at 1:00, would that work for everyone?

4          MS. SIMMS:  Yes, Your Honor.

5          MR. RAY:  Your Honor, yes, that's fine for the

6  defense.

7          THE COURT:  All right, let's do this.  It's noontime.

8  Let's adjourn and we'll resume at 1:00.

9  (Recess was held at 11:59 A.M.)

10  (In Open Court at 1:04 P.M.)

11          THE COURT:  All right, we're back on record.  Is

12  Mr. Woods able to hear?

13          THE DEFENDANT:  Yes, sir, Your Honor.

14          THE COURT:  Okay, then we're ready to go.  The United

15  States may call the next witness.

16          MS. SIMMS:  The United States calls Special Agent

17  Morgan Langer.

18          THE COURT:  Would you raise your right hand, sir, and

19  then I'll ask the Clerk to administer the oath.

20      (SPECIAL AGENT MORGAN LANGER, GOVERNMENT WITNESS, SWORN)

21          MR. GARCIA:  Thank you, sir.  Will you state your

22  full name for the record.

23          THE WITNESS:  Morgan Langer.

24          THE COURT:  Counsel may proceed.

25

```
 1                       DIRECT EXAMINATION
 2   BY MS. SIMMS:
 3   Q.   Agent Langer, where are you employed?
 4   A.   I'm employed as a Supervisory Special Agent with Homeland
 5   Security Investigations in Albuquerque, New Mexico.
 6   Q.   How long have you been employed with HSI?
 7   A.   I've been with HSI and its legacy agencies for
 8   approximately 25 years.
 9   Q.   How long have you been assigned to Albuquerque?
10   A.   Since 2007.
11   Q.   In your time as a Special Agent, have you ever worked
12   human trafficking cases?
13   A.   Yes.
14   Q.   How about specifically sex trafficking cases?
15   A.   Yes.
16   Q.   How long have you been assigned to work sex trafficking
17   cases?
18   A.   Full-time, or most of my time, since about 2012, although
19   I've had some contact with human trafficking cases for my
20   entire career.
21   Q.   Okay.  Do you still actively work sex trafficking cases?
22   A.   More or less.  I supervise the group now that has that
23   program area, although I do get quite a bit involved in the
24   cases from time to time, yes.
25   Q.   Can you tell the Court a little bit about your educational
```

1  background?

2  A.    Yes.  I have a BA in Urban Studies from Rutgers University

3  in New Jersey, and I have an MA also from Rutgers in Criminal

4  Justice.

5  Q.    As a Special Agent with HSI, do you have any training

6  specifically to sex trafficking and investigating sex

7  trafficking cases?

8  A.    Yes.  I have attended quite a bit of training hosted by

9  HSI and other law enforcement agencies and other organizations

10  geared towards human trafficking, and sex trafficking

11  specifically.

12  Q.    Have you ever had the opportunity to teach others

13  regarding sex trafficking and the sex trafficking industry?

14  A.    Yes, I have.

15  Q.    What kind of entities or people do you offer training to?

16  A.    I've taught other law enforcement officers at different

17  levels, federal, state and local.  I've taught prosecutors.

18  I've taught judges.  I've taught health care professionals,

19  teachers, nongovernmental organizations that provide assistance

20  or services to human trafficking victims.

21      I also teach for the International Law Enforcement

22  Academy, both here in the United States and overseas, anyone

23  from police officers to nongovernmental organizations, and even

24  up to high-level courses for like chief prosecutors for their

25  countries, military generals, chiefs of police for the country,

1    and politicians.

2    Q.   Why would a teacher or a health care provider need to be

3    trained on sex trafficking and what that may look like?

4    A.   Oftentimes those two professions are kind of at the ground

5    level to be able to detect trafficking and indicators of being

6    a trafficking victim.  Teachers might see it in their students

7    and health care providers might see it with people that come

8    into the hospital or into a clinic who are suffering either

9    from abuse at the hands of their trafficker, or extreme drug

10   addiction from the drugs that the trafficker provides, or from

11   the sexually transmitted disease that they've unfortunately

12   contracted through their sex work.

13   Q.   Are there subtleties, you know, that may indicate that

14   someone has been a sex trafficking victim that the ordinary

15   person wouldn't necessarily pick up on had they not been

16   trained on the subject?

17   A.   Yes.  I mean, a lot of the behaviors may mimic other

18   crimes, like domestic violence or child sexual abuse, or some

19   other crime, and often it's very difficult for the layperson to

20   determine one crime versus another.  Sometimes it's even

21   difficult for a professional to do that.  But teachers and

22   health care providers, we train them and we encourage them to

23   call in and report even when they're not certain, because it's

24   better to err on the side of caution and allow someone with

25   more training and experience to make that determination rather

1   than let someone who is being victimized to slip through the

2   cracks because the health care provider or the teacher, or some

3   other professional that comes into contact with them, is

4   reluctant to report it.

5   Q.   How many sex trafficking investigations, just an

6   approximate number, have you participated in in your career in

7   law enforcement?

8   A.   Hundreds.  Probably over 500.

9   Q.   In the course of those investigations, have you had an

10  opportunity to interview the victims of sex trafficking?

11  A.   Yes.

12  Q.   Can you give the Court, and I know this is kind of a hard

13  question, but can you give the Court an idea of how many

14  victims you've spoken with in your career in law enforcement

15  that were victims of sex trafficking?

16  A.   Also probably into the hundreds.  Possibly 500 or more.

17  Q.   About what percentage of those victims would you say were

18  minors?

19  A.   A much smaller percentage.  Probably well under five

20  percent.  It could be even smaller, down to like three percent.

21  Q.   Of the adults that you've talked to, can you give an

22  estimation of how many of those adults maybe began -- that

23  their victimization may have began as minors?

24  A.   I can.  The feeling that I've gotten is -- again, most of

25  my work has been done here in Albuquerque and Northern New

1  Mexico.  Most seem to begin when they're adults.  Some we've

2  found will begin like when they're 16 or 17.  It's relatively

3  rare that we'll see -- I know of at least one that began when

4  she was like below 15.  So I would say the majority, the vast

5  majority, at least in this area, begin their time as adults as

6  victims, or as sex workers.  But again, that may vary, and I

7  think certainly does vary by region and country, as well.

8  Q.   Okay.  So is it fair to say the sex trafficking that is

9  happening in Albuquerque may not look like the sex trafficking

10 that is happening in Thailand?

11 A.   Yes, that's a very accurate statement.  It also doesn't

12 look anything like the sex trafficking that happens in Las

13 Vegas, Nevada, or San Francisco, or New York City, or Houston.

14 Q.   Now, during your sex trafficking investigations, have you

15 interviewed any suspected sex traffickers?

16 A.   Yes.

17 Q.   Approximately how many?

18 A.   Maybe between 50 and 100.

19 Q.   Is it important in doing your investigations that you are

20 aware of the terms and the terminology used within the sex

21 trafficking industry in New Mexico?

22 A.   Yes.

23 Q.   And how -- well, let me ask you that later.

24      In your capacity as a sex trafficking investigator at HSI,

25 are there occasions when other law enforcement agencies will

1 contact you when they think they've come in contact with sex

2 trafficking?

3 A.   Yes.  We're contacted mostly by state and local agencies

4 that have less experience and less training in human

5 trafficking.  Many of them are also like former students of

6 classes that we've given where they take the class and then

7 maybe they're asked to put the principles in place, but of

8 course, if you don't do something on a regular basis, you

9 always feel more comfortable deferring to someone that does do

10 it on a regular basis.  So, yeah, we do get many calls for

11 assistance from different law enforcement agencies and NGOs, as

12 well.

13 Q.   You talked that it's mostly state and locals.  Have you

14 ever been contacted by ATF?

15 A.   Yes.

16 Q.   Have you ever been contacted by DEA?

17 A.   Yes.

18 Q.   Now, in the course of your sex trafficking investigations,

19 are you familiar with, like, the online platforms that some of

20 the advertising takes place on?

21 A.   Yes.

22 Q.   Do you know what Backpage is?

23 A.   It's defunct now, but I know what it was, yes.

24 Q.   Okay.  Is that because there was a time when Backpage.com

25 was used quite frequently as a platform by sex traffickers?

1  A.    Yes.  In its heyday, it was the number one platform

2  internationally, and certainly in the United States.

3  Q.    Why would somebody who investigates sex trafficking crimes

4  have to be familiar with a platform like Backpage?

5  A.    I mean, online ads on Backpage, and what's taken its

6  place, probably constitute certainly 90% of online sex

7  trafficking.  So to be an effective investigator, you have to

8  look at the ads, know what the ads look like, know the

9  terminology of the ads, become familiar with what ads have high

10  indicators of trafficking in them -- you know, photos, what

11  photos appear to have indicators of trafficking -- so that when

12  you do conduct the investigations or scanning of the ads to see

13  if there's trafficking victims, you have an idea so that you're

14  not just kind of fishing blindly.  You can have a more targeted

15  approach to what women -- it's mostly women -- appear to be

16  trafficked through those platforms.

17  Q.    In your training and experience, are there certain things

18  about the way an ad looks or the way an ad is written that

19  might indicate that the woman being advertised is actually

20  being trafficked?

21  A.    Yes.

22  Q.    Okay.  And what's your basis of knowledge for that?  Like,

23  how did you realize that there was a way that you could

24  differentiate the victims based on, to some extent, what their

25  ads looked like?

1    A.   Some of it was based on training, some of it was just

2    simply talking to victims and sex workers.  They have quite a

3    bit of knowledge to give to you, if they're willing, about what

4    an ad looks like that's been written by a trafficker versus

5    what an ad looks like that's been written by an independent sex

6    worker.  What photos a trafficker is more apt to want to take

7    of a woman than she might take of herself.  Also, in some of

8    the photos you might see signs of abuse.  That can be

9    indicators of trafficking.  There's also certain tattoos that a

10   woman may have on her body that can be an indicator of

11   trafficking.

12        And then we also become, just by looking at the ads, more

13   adept at finding what we call the false or fake ads, which are

14   more or less like a scam to just kind of like send someone

15   somewhere so they can maybe have their credit card number

16   stolen.  There's a lot of them on there, as well, so we

17   obviously want to just kind of stay away from those ads,

18   because the goal of a human trafficking investigation, by

19   mining ads, is obviously to find human trafficking victims, not

20   to fall into this rabbit hole of fake ads and that kind of

21   thing.

22   Q.   Okay.  What is a Backpage ad -- and I'm asking

23   specifically about Backpage, but there are other platforms that

24   are now being used to advertise commercial sex; is that right?

25   A.   Yes.

1  Q.   But at one time, you were familiar with Backpage, back

2  when it was still active; is that right?

3  A.   Yeah, and I'm still familiar with it.  It's just not

4  active any longer.

5  Q.   Okay.  What does a Backpage ad, for commercial sex,

6  typically look like?

7  A.   On Backpage, it tried to mimic Craig's List to a certain

8  extent, where they would have, quote-unquote, legitimate trade

9  on there, as well, but it was 99.9% a sex work website.

10  Typically a sex work ad would look like -- there'd be photos of

11  the females.  Like I said, it was 99% females.  The photos on

12  Backpage varied quite a bit from just sort of regular looking

13  photos of maybe a woman in just a tank top and jeans, or a tank

14  top and yoga pants, all the way down to a woman in lingerie or

15  a bra and underpants.  And then the ad would typically list

16  maybe rates, and the rates would vary by time.  So in other

17  words, an hour obviously would be more than 30 minutes.

18      The ad would always list like a phone number, almost

19  always, and the verbiage in the ads, or the writing on Backpage

20  would tend to be somewhat brief, because there was a feeling

21  among sex workers and people who used Backpage that law

22  enforcement monitored Backpage, which we did, and they would

23  try to make the ads kind of as less incriminating as they

24  possibly could.  And the ads, like I said, would widely vary.

25  That's just a generalization.  They didn't all look like that.

1   Q.    Okay.  Did people pay to use Backpage?

2   A.    At times, they did.  At times, they didn't.  Backpage

3   fluctuated back and forth between being free and being a paid

4   service for personal ads.

5   Q.    When one did have to pay to post an ad, are you familiar

6   with the types of payment that people generally used?

7   A.    Yeah.  I'd say generally it started with credit cards, and

8   then as people became more familiar with what Backpage did and

9   its purpose, the legitimate financial institutions that back

10  credit cards became concerned about being used essentially by a

11  forum that's used for sex workers and human trafficking, so the

12  credit cards, over time, stopped allowing themselves to be used

13  as a form of payment, and the payments went more and more to,

14  like, prepaid debit cards or gift cards.

15  Q.    Okay.  If somebody posted an ad on Backpage, could they

16  re-post it at a later time?

17  A.    Yeah.  A lot of them would have, like, a setting in their

18  accounts where if an ad was on for a certain amount of time and

19  then dropped so far below the top ad -- so, the ads were posted

20  by time.  Like if I post now, I'll be the top ad.  And

21  consistently the ads more towards the top were the ones that

22  got more traffic or more customers or more hits.  So a lot of

23  people that would post would have automatic, like, re-ups on

24  their ad, where if it fell below a number like, I don't know,

25  like number 20 on the ads, it would automatically get posted

1  back up to the top.

2  Q.    Okay.  Do the ads contain a contact number on them?

3  A.    Most of the Backpage did.  I'd say 98%.  Very few might

4  have like an e-mail address as opposed to a phone number.

5  Q.    What's the purpose of having a contact number or e-mail

6  address on the Backpage ad?

7  A.    So the customer can make contact with the sex worker.

8  Q.    Is it important that that contact information be accurate?

9  A.    Yes.

10  Q.    And why?

11  A.    Well, I mean, people in the business of sex work and human

12  trafficking want to connect with customers.  So if the customer

13  can't connect with you, then you're not going to get any

14  business.

15  Q.    Now, I want to go back to talking about the victims that

16  you've interviewed.  Can you give an estimation of how many of

17  those victims are immediately cooperative with law enforcement?

18  A.    Maybe -- it might vary anywhere from 10% to 20%.  Even the

19  ones that are cooperative immediately we'll find are not fully

20  cooperative.  Overtime, as we build trust with them, they

21  reveal more and more.  So, you know, it's a relatively low

22  number, I would say.

23  Q.    Is it fair -- it sounds like, and correct me if I'm not

24  stating this accurately, that even the ones that are initially

25  cooperative aren't being completely forthcoming in the

1   beginning?

2   A.   Yeah, that's correct.  I mean, many of them are very

3   distrustful.  Most of them are very distrustful of law

4   enforcement.  They've been coached certainly during their whole

5   sex work career and trafficking victim time that law

6   enforcement is the enemy, that we don't want to help them, we

7   just want to throw them in jail, and many of them are reluctant

8   because of those reasons.

9        And many of them are highly traumatized and simply

10  emotionally can't get through what's been done to them in any

11  one sitting.  So they'll be -- you know, it's a very

12  incremental, for most victims, it's a very incremental

13  interviewing process.  One of the biggest mistakes an

14  investigator in my field can make is to try to do like a, you

15  know, comprehensive interview with a victim that you just made

16  contact with.  That may cause them some trauma and it may cause

17  them a lot of emotional pain, and they might drop off the radar

18  and not recontact you.

19  Q.   When you first make contact with a person you suspect has

20  been a victim of human trafficking, how do they typically react

21  to you?

22  A.   It varies a lot by the person.  Some of them are hostile.

23  Some of them are very introverted and closed down.  Some of

24  them are being prevented from getting the drugs that they're

25  addicted to, so they're sick.  There's been several that we've

1  had to get medical help for.  A lot of them have, you know,

2  untreated medical conditions that -- they're like in a crisis

3  mode.  And some of them are so traumatized, like I said, that

4  they really can't function well for, like, a law enforcement

5  investigative interview.

6      So we kind of have to take them -- they're all people and

7  they're all different.  Some might be -- in comparison, a small

8  number -- able to talk to you right away, but many, many are in

9  an emotional crisis, a medical crisis, and you have to kind of

10  deal with that before you can get to, like, doing an

11  investigative interview.

12  Q.   Have you ever had a situation where you've come across a

13  sex trafficking victim numerous times and maybe, like, it takes

14  until the fourth or fifth encounter for her to disclose what's

15  happening?

16  A.   Oh, yeah.  Yes.

17  Q.   So is it common for victims to not want to cooperate with

18  the investigation?

19  A.   Yes, very common.  And some may even cooperate to some

20  degree, but put a qualifier on it, like "I'm not going to

21  testify," or "I don't want my name in a report," or something

22  of that nature.

23  Q.   I'm going to ask you a few questions about your -- have

24  you ever done any undercover work in your sex trafficking

25  investigations?

1  A.   Yeah.  I, myself, have done a small number, but I've

2  supervised many, many undercover agents in human trafficking

3  investigations.

4  Q.   To do a successful undercover operation, do you have to

5  have pretty substantial knowledge of the terminology used?

6  A.   Yes.

7  Q.   Do you --

8  A.   When we use an undercover agent that is not familiar with

9  sex work, they often have kind of a coaching session for them

10  to let them know what's common terminology.

11  Q.   To do that kind of undercover work, do you need to have

12  knowledge about, like, the typical going rates in the community

13  in which you're doing the investigation?

14  A.   Yes.

15  Q.   In your experience, have you ever talked to johns or

16  customers of sex workers?

17  A.   Yes.

18  Q.   Do you have any idea -- does a trafficker typically want

19  its customers to know that he's involved?

20  A.   Never.  Almost never.

21  Q.   Why is that?

22  A.   Customers are -- the answer is probably like two-fold.

23  One, I think it eliminates some of the customer's guilt when

24  they can justify to themselves that they're going to see an

25  independent sex worker, one who's not being forced to do it.

1   And two, the customers fear pimps or traffickers because they

2   fear being robbed or being harmed or something like that.

3   Q.   This is going to sound like a dumb question.   The

4   trafficker, now, he's not in the hotel room when the commercial

5   sex acts are going on, is he?

6   A.   Mostly not.   Every once in a while we'll run into a

7   situation where he might be like in the bathroom with the door

8   closed, but that's probably one out of every 200 encounters.

9   Q.   Have you ever heard of there being other people in the

10  room or near the room that are hiding their presence?

11  A.   Yeah.   I mean, sometimes when a trafficker has multiple

12  victims operating at once, sometimes what will happen is when

13  there's a date for a commercial sex act for money, one of the

14  victims will simply leave the hotel room during the date.

15  Sometimes they don't want to, for whatever reason.   And so like

16  I said, they'll be in the bathroom or maybe in a closet.

17  Q.   The dates that we're talking about where the customer goes

18  to a hotel room where the victim is "working," what is that

19  typically called?   What kind of date is that?

20  A.   Oh, when they go -- I'm sorry.   You said when they go to a

21  location?   Is that what you said?

22  Q.   When the customers come to the woman in the hotel room.

23  A.   That's called an in-call.

24  Q.   What is it called when the woman, the trafficking victim,

25  has to go somewhere else?

1   A.    That's called an out-call.

2   Q.    In your experience, are the women provided with a

3   cellphone?  Is that typical?

4   A.    They can be.  Typically if they are provided with one,

5   it's a cellphone that the trafficker obtains.  He makes sure

6   that the contacts are clean so that the contacts are -- they

7   don't have access to their contacts, or like instantaneous

8   sign-on to like their Facebook account or anything like that.

9   It's like a clean phone that's just used for business, and it's

10  usually set up so the woman can answer the phone calls from

11  customers, because obviously a customer would never ask for a

12  date if a male answers.

13  Q.    Explain that again.  What's the problem with the male

14  answering the phone?

15  A.    Customers are very reluctant to enter into any kind of a

16  commercial sex situation where they have any idea that a man is

17  present.  If you read any reviews, like sex worker reviews,

18  where a customer is reviewing a sex worker, they put up all

19  kinds of red flags if they ever think there's a pimp involved,

20  or a boyfriend, or any male kind of hanging around that doesn't

21  seem like they should be there.  So a male answering the

22  phone -- like if I were a john and I was responding to a

23  Backpage ad, I would want to speak to a woman, not a male.

24  Q.    Have you ever had a situation where customers respond by

25  text, and they may be speaking to a male, but they don't know?

1   A.    Yes, very often.

2   Q.    But when it comes to answering the phone, they want a

3   woman to answer and do the talking?

4   A.    Absolutely, yes.

5   Q.    Going back to the hotel for just a second, who typically

6   pays for a hotel room for the victims to perform commercial

7   sex?

8   A.    It can vary.  If the victim has an ID, the trafficker

9   generally prefers for the victim to pay; pay meaning register

10  for the hotel room.  But more often than not, I have seen

11  traffickers register the hotel rooms, but it's always the

12  victim that pays, in terms of it's her money.  So the victims

13  that -- for instance, let's say they have to work seven days a

14  week, or they have to work six days a week, but on the seventh

15  day they still have to do one date so they can cover the room.

16  The trafficker never covers the room with his own money, or her

17  own money.  It's always the victim.

18  Q.    In your training and experience, and this is just a "yes"

19  or "no," but are you familiar with the methods that traffickers

20  use to control their victims?

21  A.    Yes.

22  Q.    Are you aware of instances where there are multiple

23  traffickers using different methods to control the same

24  victims?

25  A.    Yes.

1  Q.   Is it common in your trafficking investigations to have

2  victims that return to their traffickers?

3  A.   Yes.

4  Q.   How about, is it typical for them, or common for them to

5  return more than once?

6  A.   Yes.

7          MS. SIMMS:  May I have a second, Judge?

8          THE COURT:  Sure.

9          MS. SIMMS:  I'll pass the witness, Your Honor.

10          THE COURT:  Counsel may cross-examine.

11          MR. RAY:  Thank you, Your Honor.  I appreciate it.

12  Can you all hear me okay?

13          THE COURT:  Yes.

14          MR. RAY:  Mr. Langer, I can't see you right now.

15  Would you be able to turn your camera back on?

16          MS. SIMMS:  I think he's on two, so keep scrolling

17  until you can see him.

18          THE COURT:  For whatever reason, I can't see him,

19  either.  I'm sorry; I see him now.

20          MR. RAY:  There you are.  All right, I got you.  This

21  is like the Brady Bunch.

22                    CROSS-EXAMINATION

23  BY MR. RAY:

24  Q.   So is it Agent Langer?  Is it okay if I call you -- or,

25  what do you want me to call you?

A.    Whatever makes you happiest, Counselor.  I'll answer

pretty much to anything.

Q.    Okay.  Well, as long as it's respectful, right?  I just

have a few things I want to ask you about.

First off, you were testifying, if I get this right, that

there are certain sets of characteristics to a relationship

that help you define whether it's a sex trafficking

relationship or not, right?

A.    I mean, I think relationship might be the wrong

terminology.  I listened to the doctor's testimony this

morning, and I thought it was very good, but luckily I think my

job is a lot easier than hers.  I just go by the legal

definition.

My decision of whether someone is a human trafficking

victim, I track it right along the federal statute.  So if

someone is an adult and has performed for a sex trafficker a

commercial sex act through force, fraud or coercion, I define

that person as a victim.  If not, they're not a victim.  They

could be an independent sex worker who has been abused or in a

bad place.  I think most of the women -- like I say, it's

mostly women in that life.  They're not -- you know, they're

not there because they choose to be.  They may not be

trafficked, but a set of horrible life circumstances have led

them to that.  I go by the legal definition for my job, so it's

a little bit more clear-cut for me, I think.

1  Q.   Okay, fair enough.  Well, you did talk about how some of

2  your experience includes educating teachers or instructors or

3  other individuals, professionals, on whether or not they might

4  be dealing with a sex trafficking victim or a human trafficking

5  victim.  Could you elaborate a little bit on what specific

6  characteristics or attributes you instruct these folks on, so

7  they know if they're seeing a potential sex or human

8  trafficking victim or not?

9  A.   Yeah.  We have a standard Powerpoint presentation that we

10 give to different professions, and it describes some very

11 general indicators.  Like, for instance, an indicator maybe for

12 a child, like a teacher and a child, might be like a child that

13 frequents escort websites, or has a sexually transmitted

14 disease.  Well, we all know those two things, they might not

15 lead to the child being a trafficking victim, but we encourage

16 someone like a teacher to contact us if they're seeing a couple

17 of these traits or indicators, and then let us, someone like

18 myself, delve into it a little more deeply.

19      What we don't want to do is make it so that professionals,

20 like teachers or health care workers, are not contacting us

21 because they think, like, they're wasting our time or something

22 of that type of behavior.

23 Q.   Okay.  So you're trying to -- again, if I'm putting words

24 into your mouth, just stop me.  What you're doing is you're

25 trying to help them see something like red flags or potential

1    indicators of sex trafficking, but you, as a law enforcement

2    officer, when you come in to investigate, you're looking for

3    activities that fit within the statutory or legal definitions

4    of sex trafficking, right?

5    A.    Like, I will occasionally get someone, a victim -- and

6    like I said, it's mostly females, mostly adult females -- that

7    legally fit the definition of a sex trafficking victim, meaning

8    they were forced, or they were caused to do commercial sex acts

9    through force, fraud or coercion, but I will look into what

10   happened and just from my training and experience realize that

11   the case, it'll never be a case, because it's not strong enough

12   to bring it to like a prosecutor.  But I will still make sure

13   that person gets services, if they want it, and I'll do the

14   same thing with independent sex workers, as well.

15        So there are occasionally some victim identifications that

16   I don't call someone like Ms. Simms over, because I just know

17   from my experience the case isn't strong enough to really go

18   much further.

19   Q.    Okay.  So you're not proposing to offer testimony on what

20   the definition of sex trafficking is, then?  That's not what

21   you're proposing to tell a jury, right?

22   A.    I mean, I can read the statute and tell you what it means

23   to me and how I apply it, but I'm not a psychiatrist or

24   psychologist or a sociologist, where I can tell you -- like, I

25   don't have some of the same qualifications as the witness this

1   morning did, no.

2          MS. SIMMS:  Judge, just to interject, we're going to

3   offer him as an expert witness, and his testimony and the

4   questions will be confined to what is admissible for him to

5   testify to.  So we will not be asking him to draw any like

6   legal conclusions that are not allowed.

7          MR. RAY:  And I appreciate that clarification.

8   BY MR. RAY:

9   Q.   So Agent Langer, now I want to talk a little bit more

10  about kind of how you apply your experience.  You discussed the

11  concept of online advertising in the context of something

12  called Backpage.  Do you remember that discussion?

13  A.   Yes.  I mean, Backpage was an online ad platform that was

14  used, like I said, 99% for sex work and sex trafficking.

15  Q.   And is your assessment that it was 99% for sex work and

16  sex trafficking based on your personal observations of the

17  platform, or is there some research that you cite or some study

18  where you get that from?

19  A.   No, just my personal observation after looking at

20  thousands of ads on Backpage.

21  Q.   Basically, what you're saying is, you've done a lot of

22  work on the Backpage and haven't seen very much that's not a

23  sex proposition; is that kind of what you're saying?

24  A.   Correct.  Like, you could go on Craig's List, for

25  instance, and it's clearly -- I mean, now Craig's List has

1  gotten rid of kind of the platforms that they used to use, that

2  used to be used for sex work, and there's clearly legitimate

3  commerce going on on Craig's List.  I didn't see that on

4  Backpage, although they tried to mimic it to some degree.

5  Q.    Okay.  Now, when you were discussing Backpage ads and you

6  said that you can tell the difference between -- or you can see

7  indicia of trafficking in certain Backpage ads, could you

8  clarify what method or what criteria you apply to say, that

9  picture has a stronger chance of being a trafficked individual

10 than, say, this other picture that I just looked at?

11 A.    Well, when it comes to that, I want to say it's by no

12 means an exact science.  It's the kind of thing that when you

13 look at enough ads and you talk to enough victims and human

14 traffickers, and if they're kind enough to tell you, you start

15 to get kind of a knowledge.

16     But there were certain, like, standard postings that were

17 in a Backpage ad that a lot of traffickers would use.  One

18 would say -- one had a banner that said, "No law enforcement."

19 There was another banner that specifically said the women

20 wouldn't see African-American customers.

21     And then there are certain photos.  Obviously, like there

22 are photos of women that were abused, that had obvious signs of

23 abuse on them.  That would be something that would be a red

24 flag for us.  There are photos of women where clearly they

25 weren't taking the photos themselves.  That's another possible

1  red flag.  Women in photos where the photos are very graphic or

2  exploitative.  I find a lot of women typically, when they're

3  taking the photos themselves, or maybe having a friend take the

4  photo, they're less likely to take the kind of photos that

5  attract -- like a very common photo a trafficker takes is like

6  a woman bent over with a close-up on her rear area.

7      We also look for photos of people that appear to be very

8  young.  You know, sort of age difficult photos where we may

9  have a juvenile trafficking victim or a juvenile sex worker.

10  And like I said, there are certain tattooing, branding they

11  call it, that are indicative of trafficking.  So like I said,

12  it's not a perfect science, but it's something you get better

13  at the more you do it.

14  Q.   And you have personally sort of engaged in this type of

15  vetting of photographs to determine whether there's red flags

16  for trafficking in those photos?

17  A.   Yes.

18  Q.   Now, do you have any sort of comparative criteria where --

19  I mean, photos that, you know, that don't have a rear-end shot

20  taken by another person, or a tattoo, or bruises or signs of

21  abuse, do you follow up on any of those, or do you see any of

22  those and find out that those have trafficking in them, as

23  well?  I mean, is there like a control group comparison that

24  ever happens?

25  A.   So, when we do proactive operations, where we react to

1   something, where we actually go out and look to encounter

2   trafficking victims, or sex workers, they're notoriously bad at

3   answering the phone calls.  It's either text or voice.  So a

4   lot of times what we'll end up doing is calling every ad that's

5   posted for that day, and --

6   Q.   Do you --

7   A.   -- ads are fake -- excuse me?

8          THE COURT:  I'm sorry, you all were talking over each

9   other at the same time.  Mr. Ray, are you there?  It looks like

10  his screen froze.

11  (A discussion was held off the record.)

12         MR. RAY:  Sorry, Your Honor.  Everything crashed on

13  me and then restarted again.

14         THE COURT:  Why don't we do this.  Why don't you ask

15  the last question again, and then we'll let Special Agent

16  Langer answer it.

17         MR. RAY:  Yes.  Would the court reporter be kind

18  enough to read the question?  Because I can't remember exactly

19  how I said it now.

20  (The record was read by the court reporter.)

21         THE COURT:  Go ahead; Agent Langer.

22  A.   As I said, when we do proactive investigations or

23  operations, not reactive, but when we're trying to encounter

24  trafficking victims or sex workers, they're notoriously bad at

25  answering phone calls or text messages, so we often end up

1   calling every ad that's posted for that day.  It's usually

2   right around -- at that time, it was probably a number between

3   30 and 50.

4        So we would start with the trafficking indicator ads and

5   then work our way to the ones that, to our knowledge, didn't

6   have any trafficking indicators, and yes, we did find that

7   there were victims in those ads, in those ads that didn't look

8   obvious to us.  And we would also find that they had people

9   victimized historically, that are not currently trafficked, but

10  they were trafficked in the past.

11  BY MR. RAY:

12  Q.   Okay.  Thank you for that.  Now, you used the phrase

13  mining ads.  What do you mean when you say mining ads?

14  A.   It's just a fancy term for like, you know, looking at the

15  ads of the day, or the last couple of days, and just seeing,

16  you know, which ones look more interesting than others.

17  Q.   Okay.  You had also discussed the fact that you have

18  interviewed many victims of sex trafficking, correct?

19  A.   Yes.

20  Q.   Have you also interviewed many sex workers who you

21  wouldn't describe as victims of sex trafficking?

22  A.   Yes.

23  Q.   And when you are coming into contact with an individual

24  you think might be a victim of sex trafficking, would you agree

25  that your status as a law enforcement officer colors the way

1  that they view you and the degree to which they will want to

2  speak forthrightly with you?

3  A.   I think it goes by the person.  I've had ones that

4  absolutely would not speak to me, and never would, and then

5  I've had ones kind of in the middle, and then I've had ones

6  that were very open really from the beginning.  So it's very

7  hard to generalize how a person's going to react to you.  I've

8  had some surprises, and I've had some that reacted just the way

9  I thought they would.

10  Q.   Okay.  And would you say you can't necessarily predict how

11  a potential sex trafficking victim is going to interact with

12  you when you make contact?

13  A.   No.  I mean, I think the prevailing idea is that they're

14  going to be noncooperative and hostile at first, but again,

15  I've had all manner across the spectrum.

16  Q.   And what would you give, based on your experience, as the

17  reasons for their typical initial hostility or lack of

18  cooperation?

19  A.   Some of them have been coached by the traffickers that law

20  enforcement is the enemy.  Some of them are fearful of being

21  taken to jail.  Some of them have had life-long negative

22  contact with law enforcement.  Some of them are, like I said,

23  in an emotional or medical crisis.  There can be any number of

24  factors, and that's part of what we have to find out, is what's

25  going on with them.  Why are you so angry at me?  Thus far, we

1  haven't treated you -- like, I'm not one to treat them badly at

2  all.  I've seen police officers and law enforcement officers

3  that have, but I try to treat them with dignity and respect,

4  like I would anybody else.

5  Q.   And do a lot of them fear criminal repercussions for

6  themselves being involved in sex work?

7  A.   Absolutely.  A lot of times I find that is coached by the

8  traffickers.  They tell them, you know, if you admit to

9  prostitution, you'll be thrown in jail.  And then a lot of them

10  are also fearful that -- they're addicted to heroin, and that

11  they're going to have to detox in jail, which is a horrible,

12  horrible experience for them.

13  Q.   Do you find that some of them have had experiences of

14  going to jail or facing criminal charges before meeting you?

15  A.   I mean, arrests for prostitution.  Some of them do have

16  criminal histories for other things.  Mostly drug offenses,

17  like possession-level drug offenses.  So, yes, many of them

18  have been in jail and have suffered the effects of having to

19  detox off of heroin in the jail cell.

20  Q.   I appreciate you bearing with me on these questions,

21  because I'm just sort of trying to get at what I would call

22  your dataset that informs your understanding of sex

23  trafficking.

24      When you're getting information from a potential victim of

25  sex trafficking, do you ever encounter situations where they

1  hope to get a benefit, such as reduced criminal charges or

2  having charges not pursued, if they will cooperate with a sex

3  trafficking investigation?

4  A.    No.   And again, different law enforcement might operate

5  differently than I do.   But when we conduct our investigations

6  and we encounter sex workers, we won't arrest any of them for

7  sex work, really, or for anything else, unless it's something

8  like they have an outstanding warrant for murder or something

9  like that.   But other than that, excluding that, we don't

10 arrest them.   I make that very clear to them from the

11 beginning.

12        And they are offered services, services meaning through an

13 NGO that's independent of me.   I have no power or control over

14 the autonomous NGO.   I merely make the call.   And like I said,

15 I will offer the services -- say it's someone who's just an

16 independent sex worker that has confided, hey, I'm hooked on

17 heroin, I don't want to be doing this, I'm just want to get out

18 of this life.   I will offer them the same service.

19        So they get absolutely nothing out of me in exchange for

20 cooperation, and they -- in fact, I've had ones that didn't

21 cooperate, and I still put out there, "Well, I'd still like to

22 see you get some services, because this is not something I'd

23 want to see, you know, my sister doing or my mother doing, or

24 something like that, and I don't want to see you do it,

25 either."  So the long answer to your question is, no,

1  Counselor.

2  Q.   And you're saying that's not your practice?

3  A.   My practice is they don't get anything for cooperating,

4  other than the justice that they're a trafficking victim and

5  they'd like to cooperate in the human trafficking

6  investigation.

7  Q.   Okay.  Now, do you know Matthew Woods?

8  A.   Just the name.

9  Q.   Have you reviewed any materials connected with this case?

10  A.   Yes.

11  Q.   What did you review?

12  A.   Very early on, I was involved in the case.  I believe it

13  was certainly before Matthew Woods' involvement came out.  I

14  don't know very much about Mr. Woods.  I was present at the

15  search warrant that was executed on the Galloway's house, and I

16  have spoken to Cornelius Galloway.  And then shortly after the

17  search warrant, my involvement in the case kind of ended.

18  Q.   So you didn't speak to any of the alleged victims in this

19  case, either, right?

20  A.   I spoke to one young woman, and by young, she was not a

21  child.  She was maybe 18, 19.  I don't recall her name, though.

22  Q.   I think that Ms. Simms has already clarified this, but

23  you're not planning to offer testimony from an opinion

24  standpoint about the Galloway organization or Mr. Woods,

25  correct?

1  A.   I haven't been told I was.  At this point, I don't have

2  enough of the case materials where I could really even offer an

3  informed opinion.

4  Q.   Okay.  Have you prepared any type of report for your

5  anticipated testimony in this case?

6  A.   Not related to this, but like I said, early on in the

7  investigation I was involved in, I probably did maybe five or

8  six reports, very early on.

9  Q.   Okay.  You also referenced a Powerpoint presentation that

10  you use.  Would you mind if I ask you to share or send me a

11  copy of that Powerpoint presentation?  Or you can send it to

12  Ms. Simms and she can send it to me.  Is that something you'd

13  be willing to share?

14  A.   If it's to be in open evidence, I wouldn't be willing to

15  share the law enforcement only ones that we teach, but -- I

16  would prefer to talk to Ms. Simms and my internal HSI

17  management before I send out our Powerpoints.

18  Q.   I understand.  I just thought I would ask.

19           MS. SIMMS:  And just to interject, are you asking for

20  the ones for health care and teachers?  Because that's going to

21  be different than what may be law enforcement sensitive.

22           MR. RAY:  Yes, actually.  The one he was referencing

23  in his testimony today, which it sounded like he uses for

24  social workers and teachers to identify red flags.  If he has

25  something that has law enforcement -- you know, I'm not as

1  concerned about that, you know, conducting law enforcement

2  investigations.  That doesn't seem to be what he's testifying

3  about.

4          MS. SIMMS:  Can we confer on that?

5          MR. RAY:  Yes, absolutely.

6          MS. SIMMS:  Because I haven't seen it, either.

7          MR. RAY:  Yes, I don't want to take up you guys' time

8  on this today.  I'm going to look at my notes here real quick

9  and see if I have any more questions really quick, Special

10 Agent Langer.

11         THE WITNESS:  Okay.  No problem, Counselor.

12         MR. RAY:  Mr. Harrison, did you have anything else

13 that you wanted to ask him?  If not, I'm going to pass him.

14         Pass the witness, Your Honor.  Thank you.

15         THE COURT:  Let me just quickly ask, Agent Langer, I

16 think I heard you use the term NGO.  Is that non-- what does

17 that stand for?

18         THE WITNESS:  That's nongovernmental organization.

19 So, basically like a nonprofit.

20         THE COURT:  Okay.  So when you were talking about

21 offering services to victims through like an NGO, would an

22 example be, let's say for a victim that has a substance abuse

23 addiction, you would offer to maybe help get that person into a

24 treatment program that's run by a nonprofit entity?  Is that

25 kind of what you were talking about?

1   THE WITNESS:  Yes, that's correct, Your Honor.  And

2   like I said, we try to not -- we don't try.  We don't dictate

3   to the NGO or the nonprofit what they should do.  We just kind

4   of present to them, hey, we have someone that appears to us to

5   be a human trafficking victim, or even just a sex worker in

6   need of help, these are the problems that she's reporting,

7   whether it's a drug addiction or an untreated STD, and then we

8   kind of leave it to the caseworker that works with the

9   nonprofit to triage what they need to do with her.  So we're

10  not -- we don't want to direct them what to do, I guess is what

11  I'm trying to say.

12  THE COURT:  So these could be either social workers

13  or medical field workers that work with people -- it could be

14  someone who is homeless or could be a sex trafficking victim,

15  right?

16  THE WITNESS:  Yeah.  One that we use 95% of the time

17  here in New Mexico, it's called Lifelink.  They're based out of

18  Santa Fe.  And the caseworkers go through -- some of them are

19  social workers, but some of them just go through like an

20  internal training program that the Lifelink offers.

21  But, yes, you're right, they offer help to other

22  types of people, not just trafficking victims.  Also the

23  homeless, drug addicts, that type of thing.  You're right, Your

24  Honor, yes.

25  THE COURT:  I follow you.  I just wanted to make

1   sure.  I thought that's what you meant, but I wanted to clarify

2   that.

3              Is there any redirect of the witness?

4              MS. SIMMS:  Just shortly.

5                       REDIRECT EXAMINATION

6   BY MS. SIMMS:

7   Q.    You were testifying a little bit about a typical proactive

8   investigation that you do into sex trafficking activities.

9   When you talk about a typical proactive investigation, you are

10  not talking about going out and arresting prostitutes, correct?

11  A.    Correct.  And again, this is what we do here at HSI, but I

12  can't speak for every law enforcement agency.  When we do these

13  types of operations, our goal is to identify human trafficking

14  victims and their traffickers, not to arrest prostitutes for

15  misdemeanor charges.

16  Q.    And, in fact, HSI can't arrest prostitutes for misdemeanor

17  charges, that's not a thing that your agency does, correct?

18  A.    Correct.  There's no federal statute to even cover sex

19  work or prostitution.

20  Q.    So when you encounter these women, is it a fair statement

21  that you at least offer them services regardless of what they

22  tell you, if anything, about whether or not they're being sex

23  trafficked?

24  A.    Yes, absolutely.  Every one of them that we encounter is

25  offered services.

1   Q.   You mentioned that -- I don't know if you specifically

2   mentioned it, or if you alluded to it, but are there times when

3   women are cooperative in the beginning, and then they somewhere

4   along the line decide not to be cooperative?

5   A.   Yes.

6   Q.   And those women, if you'd offer them services, you don't

7   take that away from them because they've decided to be

8   uncooperative; is that right?

9   A.   No, absolutely not.  And that's one of the main -- I mean,

10  that's one of the reasons that we maintain this autonomy from

11  the nonprofits that help us, is because they do the services

12  and we do the law enforcement, and I don't ever want those

13  boundaries to be crossed or disappear.  It's very important

14  that these women fully trust the nonprofits, even more than

15  they trust us.

16          MS. SIMMS:  Just a second, Judge.  No further

17  questions.

18          THE COURT:  All right.  Thank you, Agent Langer.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  You're welcome to remain on the Zoom

21  call, or if you wish to be excused, whatever your preference.

22          Did counsel wish to make any closing arguments?

23          MS. SIMMS:  Just briefly, Your Honor.

24          Going to Dr. Mehlman-Orozco, I think she's clearly

25  qualified to an extent where she actually has done some

1   scientific research in this and participated directly in

2   gathering qualitative data about sex trafficking.  She's done a

3   ton of research, she's published a book and several articles.

4   I did not hear any objection or challenge to her qualifications

5   whatsoever.

6        Clearly she has articulated that this niche, this

7   world of sex trafficking, is not something that people in the

8   general public know.  Our jurors are not going to be familiar

9   with something like a trauma bond.  They're going to -- you

10   know, people that aren't exposed to this type of exploitation

11   are not going to have any idea how these victims react the way

12   they do, because it can be counterintuitive to somebody that

13   isn't familiar with the themes.  So I think that the Government

14   wishes to educate the jury about this, because that's the only

15   way that they can fully understand.  I think she's more than

16   qualified to give opinion testimony about this.

17        Agent Langer is basically the law enforcement sex

18   trafficking expert.  He has taught internationally.  He teaches

19   -- he's gone over his teaching experience.  It's very similar

20   to, you know, a narcotics expert.  They know the terminology,

21   they've done undercover operations, they've done hundreds of

22   these cases, they're familiar with how business is conducted in

23   this way.  It's the exact same type of expert.  He doesn't have

24   to be a scientist, but he does possess the specialized

25   knowledge and experience to give expert testimony on this.

1    I think, you know, potentially testimony from these

2  two experts could overlap significantly, but I think that we

3  have kind of drawn a boundary and given the Court and the

4  parties where we want to go, and both of their testimony will

5  be focused on different aspects of this case.  I think that

6  Dr. Mehlman-Orozco can offer like more of a scholarly take on

7  this and how this effects victims.  She's qualified to do this,

8  to say why victims react the way they do.  She's qualified to

9  testify about the means and what specifically traffickers do to

10 get these women to comply with them, and what that looks like,

11 whereas Agent Langer can bring it into more of a local

12 perspective and testify to kind of the law enforcement side and

13 the nitty-gritty details of how this operates, how it's posted,

14 who's in the room or not in the room, what are the rates, what

15 are the specific things --

16    THE DEFENDANT:  Can I speak to my attorney, Your

17 Honor?

18    MS. SIMMS:  -- you know, that are said.

19    THE COURT:  Yes, Mr. Woods, just a second.  I'll take

20 a break when counsel finishes.

21    THE DEFENDANT:  All right.

22    MS. SIMMS:  And so the jury needs to hear this stuff,

23 because otherwise they're just not going to be fully educated

24 on it.  It's like trying a case without telling them -- you

25 know, trying a drug case without telling a jury how drug

1   trafficking works.  It's the same thing.

2          I think it's fully appropriate, and it's based --

3   there's a precedence in case law for it.  You have many cases

4   where this type of testimony was admitted and it was upheld on

5   appeal.  I just wrote something in another case that lists

6   those, and I don't have it in front of me.

7          But we feel like this is appropriate testimony, the

8   witnesses are certainly well qualified, and they have something

9   to offer to the jury as far as to help them come to a decision.

10          THE COURT:  Why don't we do this.  Mr. Woods asked if

11   he could confer with his attorneys.  So can we go into -- I'll

12   ask the Court Clerk to put them in a break-out session.

13          MR. RAY:  Thank you, Your Honor.

14          THE DEFENDANT:  Thank you, Your Honor.

15          MR. GARCIA:  I'll do that now.

16   (Recess was held at 2:15 P.M.)

17   (In Open Court at 2:20 P.M.)

18          THE COURT:  Are we ready to go back on the record?

19          MS. SIMMS:  Yes, Your Honor.

20          MR. RAY:  Yes, Your Honor.

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  All right.  Then defense counsel may make

23   closing summations.

24          MR. HARRISON:  Your Honor, I was going to briefly

25   address Dr. Kim.  It is true that the trauma bonding concept

1   has been the subject of permitted expert testimony in a number

2   of federal courts.  I guess what we'd like to limit her

3   testimony at is, first off, that she is a general principles

4   expert.  She made it clear that she's not -- the disclosure

5   requirements haven't been followed and she's not prepared to

6   offer an opinion as to any type of application of those general

7   principles to this specific case, and I guess we'd like to have

8   that be clarified, that that rule shouldn't be circumvented

9   with pointed hypotheticals, the questions about the consistency

10  of Mr. Woods' conduct or observations of past cases, etc.

11          And substantively, we think it would be appropriate

12  to limit her to discussing trauma bonding as a general concept,

13  explaining -- Ms. Simms' disclosure put it well.  It was

14  something like, unusual reactions or nonideal reactions to

15  these situations.  And to be barred from talking about what

16  conduct constitutes sex trafficking.  I thought it was

17  ultimately clear in her way of defining sex trafficking that

18  she was keying off of the legal elements and basically just

19  doing the equivalent of the law enforcement expert in a 1983

20  case who wants to tell the jury, yeah, that guy used excessive

21  force, and my expertise is that that guy used excessive force.

22  She is doing a similar thing here.  What she wants to do is get

23  up and say, yes, this meets the elements of 1591 because he,

24  and then she didn't even -- it's not even like they have

25  different terminology in the clinical field, it's literally the

1  words from the statute.  She was unable to identify any type of

2  antecedent for her, quote-unquote, benchmark or threshold other

3  than, again, other legal antecedents.

4         And so we would ask, again, for her testimony to be

5  limited to general principles of trauma bonding and of the

6  effect, I guess, the effect of sex trafficking on victims, and

7  not further.  Thank you, Your Honor.

8         MR. RAY:  And, Your Honor, if it pleases the Court,

9  I'll address the witness that I spoke to, which was Special

10  Agent Langer.

11         Again, the defense's position there is that if

12  somebody is being offered up as an expert, under Rule 702 of

13  the Rules of Evidence, there are still certain standards that

14  have to be met, and I get that Special Agent Langer has a long

15  history in investigating sex trafficking, but that's not all

16  that's required for expert testimony to be presented to the

17  jury.

18         Another point is that it has to be helpful and it has

19  to be to information that a layperson or a nonexpert couldn't

20  grasp, or some kind of esoteric knowledge.  Counsel for the

21  Government did make a comparison to drug trafficking cases, but

22  that is not really an apt comparison.  What we do get in the

23  drug trafficking cases, often the Government puts on a witness

24  who talks about, well, this is what a drug trafficking

25  organization looks like, or these are some characteristics.

1     But the reason why that testimony comes in, it isn't

2 just to let another law enforcement officer come in and

3 essentially vouch for, or try to explain away weaknesses in

4 eyewitness testimony.  And that's what this witness is being

5 presented to do.  Instead, in a drug case you're commonly

6 hearing testimony, for example, because the Government has to

7 prove an intent element that's not always easy to ascertain

8 from direct evidence, but requires an inference, they have an

9 officer come in and say, yeah, I have lots of experience with

10 drugs and I know with this particular substance, this amount is

11 not a personal use quantity, it's a distribution quantity for

12 X, Y, Z reasons.  But when they start getting into saying,

13 yeah, I've looked at this trailer house and it looks like a

14 stash house to me, then that sort of testimony doesn't come in

15 and it gets limited.

16     And so the testimony that they're trying to offer

17 here is more analogous to the type of drug trafficking

18 testimony that doesn't come in.  It's the stuff that isn't

19 hopeful.  They just want to paint a seedy picture.  Look at the

20 ugly underbelly of a sex trafficking or human trafficking

21 organization.  Here are some characteristics of one.  And yet,

22 it's not logically tied to the facts of this case.

23     The agent, himself, even testified that when he is

24 looking at some of these components, tools of the trade, if you

25 want to call them that, about what he's going to testify, he

1   even says, I don't have a criteria for necessarily -- I don't

2   necessarily have a scientific way of knowing whether I'm

3   looking at sex trafficking or not, or whether this Backpage ad

4   is a sex trafficking ad or not.  So if his testimony is just to

5   come in and say, I'm a law enforcement officer and I know what

6   sex trafficking organizations look like, here's some

7   attributes, and it's not logically related to this case

8   necessarily, and it's not scientific, and it's not even

9   necessarily esoteric knowledge, because you're going to have

10  individuals coming in and saying, presumedly, I was trafficked,

11  I was forced to perform commercial sex acts, then how is a law

12  enforcement officer essentially trying to help that testimony

13  be helpful to the jury from an expert standpoint?

14          It looks like it's just trying to lend credibility to

15  Government witnesses.  So for that reason, Your Honor, the

16  defense would request that that testimony be limited, or that

17  it not even be offered at all.

18          THE COURT:  The point you're making, there's a

19  famous -- I can't remember the name of the case.  I think it

20  was a U.S. Supreme Court case.  It was authored by the late

21  Justice, if I'm not mistaken, Potter Stewart.  But it had to do

22  with -- it may have been the distinction between pornography

23  and art.  But the majority opinion, it kind of essentially

24  said, you know, pornography may be hard to define, but I know

25  it when I see it.

1    Isn't that kind of -- in the questioning of Agent

2    Langer, not every ad on Backpage is going to be soliciting some

3    kind of commercial sex activity.  But if someone has enough

4    familiarity with it, then they know it when they see it.  I

5    mean, isn't that kind of testimony allowed?  It's not so much

6    the scientific principles under Daubert, but it would be more

7    what the U.S. Supreme Court said in Kumho Tire.

8         MR. RAY:  Your Honor, I appreciate that.  And yes,

9    that was Potter Stewart.  What my response would be is that,

10   yes, it can be appropriate for an expert to say, yep, I've had

11   a lot of experience with this, so when I see it, I sort of know

12   what I'm looking at.

13        I didn't take from Special Agent Langer's testimony

14   that he had a strong degree of confidence, especially because

15   there definitely are a wide variety or type of Backpage ads.

16   And I bring that up as one example, because I think of it as

17   tools of the trade type testimony, like we see in drug cases.

18   But it just doesn't seem as clear-cut as the type of testimony

19   that you see in drug cases where they say, oh, yeah, if a

20   person has 50 grams of meth, that's 12,000 doses, no single

21   person could take that in in a year, so it's distribution.

22   That's what we see.  This was more, I want to use the phrase

23   noncommittal, as to this particular tool of the trade.

24        So I get it, yes.  You know it when you see it

25   because of your experience.  But you would expect to help a

1   jury out, that you could give them something a little more

2   concrete, and in the realm of pornography, I think it is an

3   interesting comparison, because it also is one where they were

4   trying to find standards to draw the line between a First

5   Amendment case and not a First Amendment case where they could

6   be regulated as such.  So your point is well taken, Your Honor.

7            THE COURT:  All right, anything else from the United

8   States?

9            MS. SIMMS:  Just that this type of testimony has been

10  admitted in numerous cases before.  I think it will be helpful.

11            Just to be clear, you know, specific to the

12  Backpage ads, Agent Langer, like Dr. Mehlman-Orozco, will be a

13  witness who is just informing the jury of these themes within

14  the realm of their expertise.  So we're not going to ask Agent

15  Langer -- we're not going to show him a Backpage ad and say,

16  what about this indicates to you human trafficking.  We're not

17  going to connect the dots like that.  But I think what he's

18  testified to today is certainly relevant, and those dots will

19  obviously be connected, especially considering that the

20  Defendant is charged with conspiracy, which makes his

21  co-conspirator's actions, as well -- while they may be

22  different, they may have held different roles, we're going to

23  explain those, too.  So this testimony is relevant not only to

24  what Mr. Woods is doing, but what his co-conspirators are doing

25  that creates the entire organization.

1              THE COURT:  Okay, just a couple of general comments.

2              First, I would -- I mean, this is not only true for

3    this case, but any other case.  Clearly if expert opinion

4    testimony is allowed, it's improper for the expert to tell the

5    jury how they should decide the case.  So that's a given.  Like

6    I said, that general rule is going to be enforced not only in

7    this case, but it's enforced in every case I have where expert

8    testimony is relied upon.

9              The two U.S. Supreme Court cases, obviously, that

10   control are Daubert and Kumho Tire.  I'm going to take a look

11   at the qualifications, which is first.  The expert has to be

12   qualified in the area.  The proposed testimony has to be

13   reliable, and next it has to be relevant.  And then finally, it

14   has to have probative value, and of course, that last one, the

15   probative value, can't be outweighed by unfair prejudice under

16   Rule 403.  So those are the four areas I'm going to look at.

17   And then what I'll do is, I'll take this under advisement and

18   then issue a written decision.

19              All right, anything else we need to take up today?

20              MR. RAY:  Your Honor, you had said you wanted to take

21   up some scheduling.

22              THE COURT:  Oh, yes.  That's a good point.

23              First, obviously this case is a priority case in

24   terms of cases on my docket, but it's not the only case I'm

25   handling.  So I don't see, realistically, I don't see us being

1    able to get to a jury trial before the end of the year.

2           And this is going to be a complex -- the other thing

3    I was going to mention is that, for example, I know we have

4    potential witnesses who are out of state.  As counsel may be

5    aware, we have one courtroom that is equipped to do a jury

6    trial now in this era of COVID-19, and I have to share that

7    with other judges who also have cases that need to go to trial.

8    So we have kind of a priority -- we have to get the case on the

9    priority call list, so to speak.

10           So realistically, I can't -- trying to come back

11   right after the holidays and doing this the first week of

12   January strikes me as a little bit challenging, so

13   realistically, I'm thinking that the beginning of February

14   would be the earliest we could go and get this case on a

15   priority setting where it's not going to be trailing another

16   case.  So I wanted to throw that out.

17           And I'll also throw out, I just don't see this case

18   as one that we should be running on a trailing docket because

19   of the complexity of the case and the fact that you've got

20   out-of-town witnesses.  Do you all disagree with me on that?

21           MR. RAY:  Not at all, Judge.

22           MS. SIMMS:  No.

23           THE COURT:  Okay.  Should we target a February trial

24   setting?

25           MS. SIMMS:  We can, Judge.  And I'm not aware -- I

1   know that Judge Vasquez has set another case of mine that is

2   also turning into quite an ordeal for February 1st.  I don't

3   know where it is, if it's trailing something else, if it's a

4   definite, but I do have that.  And then I have a homicide case

5   set for March 4th.

6           THE COURT:  How long do you think this case would

7   take to try?  Two weeks?

8           MS. SIMMS:  I don't think it'll make two weeks, but

9   probably in between a week and two weeks.

10          THE COURT:  I'll tell you this.  Again, utilizing the

11  safe distancing practices, and having just done a trial that

12  involved -- it was a felony murder case off the Isleta

13  Reservation.  You can only -- the voir dire takes, I would say,

14  anywhere from twice as much to maybe -- well, a third to twice

15  as much, because you can only voir dire 22 prospective jurors

16  at a time and maintain the CDC recommended social distancing

17  guidelines.  So that inevitably means you're having to repeat

18  the process over.  And I would think a case like this,

19  potentially -- on that homicide case, we did three panels in

20  one day, and you've got a lot of moving parts, because you have

21  to keep the 22 jurors socially distanced, but you also can't

22  mix them in with the others.  So it creates some logistical

23  challenges, and it really stressed out everybody doing three

24  panels.  So I've come around to the court staff's view that you

25  do a morning session, you do an afternoon session, and then you

1    do a next day session.

2          In a case like this, I could potentially see a lot of

3    jurors having difficulty.  In other words, I could see the need

4    for three panels to select a jury.  So if you're looking at

5    three panels, that's a day and a half to select your jury.

6          So realistically, I think to play it safe -- and

7    again, these are my thoughts, and at some point counsel is

8    welcome to disagree with me.  You need a day and a half for

9    voir dire.  Let's say you did that, then you could give opening

10   statements.  So you're looking at two days into the trial,

11   potentially, before you hear your first witness.  So I would

12   think you need realistically, say, a week and a half on a case

13   like this.  That's just my ballpark estimate right now.

14         Does defense counsel disagree with that assessment?

15         MR. RAY:  Your Honor, I would agree with that

16   assessment.  And it's not just because it is COVID and we're

17   dealing with the special restrictions associated with the

18   pandemic, but when you have allegations of sex abuse and sex

19   trafficking, even in a straight-forward aggravated sex abuse in

20   Indian Country case, the voir dire takes longer, even under

21   normal circumstances.  So I agree, you've hit the nail on the

22   head.

23         THE COURT:  I agree.  In fact, you may need four

24   panels for a case like this, so potentially you're looking at

25   two days for jury selection.

1    So anyway, if we could target a February trial

2  setting, I wouldn't be opposed to maybe mid February.  In other

3  words, I'd have to see what the other judges have, and

4  hopefully, Ms. Simms, you wouldn't have to go back-to-back in

5  front of Judge Vasquez and then in front of me, or vice versa.

6  But we can explore those.  Although I'm sure from your state

7  court days, you probably did that.

8    MS. SIMMS:  I've done back-to-back homicides for,

9  like, four months, so this will be like old times.

10    THE COURT:  And you've got Mr. Burkhead there who's

11  done back-to-back trials, no doubt, in his career.

12    MS. SIMMS:  We'll work it out, Judge.

13    THE COURT:  But anyway, we'll work it out.  But I

14  think what I'm going to do is, I'm going to try to -- I'll

15  alert the Clerk's Office in terms of getting on that priority

16  setting, that we're potentially looking at a February setting

17  and that we need to be the priority case when we do the jury

18  selection.

19    Now, aside from these motions, and of course there's

20  going to be motions in limine, does defense counsel anticipate

21  filing any more substantive type motions?

22    MR. HARRISON:  We've discussed one, Your Honor, but I

23  don't think we foresee a lot of major new motion practice.

24    THE COURT:  All right.  How about from the United

25  States?

1          MS. SIMMS:  I don't anticipate filing anything new,

2    unless there are some sort of changed circumstances between now

3    and trial.

4          THE COURT:  Okay.  I guess what I don't want to have

5    to do is be having to do a substantive motion where there are a

6    number of legal issues and we're jamming it through to get it

7    decided right before jury selection.  I want to have plenty of

8    time for counsel to prepare for this, and I need time in order

9    to rule on any pending matters.

10          Anyway, that's kind of what I'm thinking.  So I'll

11   alert the Clerk's Jury Department that for this case, we're

12   kind of tentatively looking at a February setting, and then

13   I'll get a decision out on this as soon as I can.

14          Anything else we need to take up today?

15          MR. RAY:  No.  Thank you for your time.  We

16   appreciate it.

17          THE COURT:  All right, I appreciate everybody -- I

18   think handling it by Zoom, it actually has worked out well, so

19   I appreciate everybody's cooperation, and I appreciate

20   Mr. Woods consenting to having this by Zoom.

21          THE DEFENDANT:  Thank you, Mr. Johnson.

22          THE COURT:  All right.  With that, then, we'll be in

23   recess.  Thank you.

24   (Proceedings adjourned at 2:43 P.M.)

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                              )
UNITED STATES OF AMERICA,      )
                              )
          Plaintiff,           )
                              )
     vs.                       )    No. 1:17-CR-01235-WJ
                              )
MATTHEW WOODS,                 )
                              )    Motion Hearing via
          Defendant.           )    Zoom Videoconference
_____)

CERTIFICATE OF OFFICIAL COURT REPORTER

     I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

Realtime official Court Reporter, in and for the United States

District Court for the District of New Mexico, do hereby

certify that pursuant to Section 753, Title 28, United States

Code, that the foregoing is a true and correct transcript of

the stenographically reported proceedings held in the

above-entitled matter on Tuesday, October 27, 2020, and that

the transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.

Dated this 15th day of December, 2020.


_____
MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
UNITED STATES COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102
Phone:  (505)348-2334
Email:  Mary_Loughran@nmd.uscourts.gov